Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Elissa A. Buchanan (SBN 249996)
Abraham A. Maggard (SBN 339949)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
eabuchanan@saverilawfirm.com
amaggard@saverilawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **REECE YOUNG and ASHLEY VELEZ,** individually and on behalf of all others similarly situated,<br><br>   *Plaintiffs*,<br><br> v.<br><br>**BYTEDANCE INC. and TIKTOK INC.,**<br><br>   *Defendants.* | Civil Action No. 3:22-cv-01883-VC<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>CLASS ACTION |

Plaintiffs Reece Young and Ashley Velez, on behalf of themselves and all others similarly situated, file this Second Amended Class Action Complaint against Defendants ByteDance Inc. ("ByteDance") and TikTok Inc. ("TikTok") (collectively referred to as "Defendants") for negligence and violations of California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, UCL §17200, demanding a trial by jury on all claims for which a jury is permitted. Plaintiffs make the following allegations based on personal knowledge as to the facts pertaining to themselves and upon information and belief, including the investigation of counsel, as to all other matters.

## I.      INTRODUCTION

1.      TikTok is one of the most popular social media apps in the world. Plaintiffs were hired by contractors to perform work for TikTok moderating content on the platform. As set forth herein, TikTok controlled every meaningful aspect of Plaintiffs' work other than the delivery of Plaintiffs' pay. TikTok provided the tool to do the job, set the quotas to do the job, set the accuracy requirements for the job, fed offensive and harmful content to Plaintiffs through their tool at a rate, pace and frequency which TikTok knew, or should have known, would cause harm. TikTok failed to provide reasonable safeguards, which it knew would mitigate the harm that it was causing to Plaintiffs.

2.      Plaintiff Ashley Velez worked as a content moderator for TikTok. She was hired by Telus International ("Telus") to perform content moderation for TikTok.

3.      Plaintiff Reece Young worked as a content moderator for TikTok. He was hired by Atrium Staffing Services Ltd. ("Atrium") to perform content moderation for TikTok.

4.      Even though Plaintiffs worked for different companies in cities thousands of miles apart, Plaintiff Velez and Plaintiff Young performed the exact same work in the exact same way because their work was directed and controlled not by their ostensible employers, but by Defendants.  In fact, their ostensible employers had little to no knowledge of what work was actually being done by the Plaintiffs, given that the instructions were regularly provided in Chinese (the native language of employees of Defendants whose identities remain unknown), and Plaintiffs were forced to use web-based translation tools to translate instructions from Chinese to English. Neither Plaintiff's employer communicates in Chinese in the workplace.

5.      In directing and controlling the work of Plaintiffs and other members of the proposed class, Defendants failed to comply with applicable standards of care in the conduct of their business, specifically in regard to the increased risks of psychological trauma and trauma-related disorders resulting from exposure to graphic and objectionable content. Defendants' affirmative conduct, as set forth in more detail below, was a substantial factor in causing Plaintiffs' injuries.

6.      Plaintiffs and other content moderators use Defendants' proprietary TCS software to do their work. This software, provided pre-loaded onto computers given to Plaintiffs and other proposed class members, is also used to monitor and evaluate the work performance of content moderators. Additionally, the software provides the videos and tools for content review.

7.      Moderators spend many hours each day reviewing graphic material. Content moderators are provided videos at a rapid pace and are required to review and assign them flags based on TikTok's current policies. If content moderators take necessary health breaks, such as a couple minutes to recover after seeing a particularly graphic post, they are immediately flagged by the software as not reviewing videos, creating a negative impact on their performance metrics. They are thus forced to watch more and more objectionable content while foregoing mental health breaks that Defendants know or should know are necessary to prevent harm.

8.      Content moderators are further required to undergo accuracy tests provided by TikTok. While reviewing videos at breakneck speeds, content moderators are expected to be extremely precise at the same time, matching flags exactly as to how TikTok moderators and managers would flag the content. The accuracy rates demanded and enforced by TikTok are virtually impossible to achieve, and impossible to achieve without creating harm to content moderators.

9.      Content moderators further receive instructions, changes in policies, and other necessary communications regarding their jobs directly from TikTok. This includes documents in Chinese that content moderators would have to translate using online applications.

10.     Although Plaintiffs ostensibly worked for different companies, they performed the same tasks, in the same way, using applications provided by Defendants. They had to meet quotas set by Defendants, were monitored by Defendants, were subject to discipline by Defendants, had their pay determined by Defendants, and were reviewed and evaluated by Defendants. The quotas that were set

caused the harm that Plaintiffs suffered. The monitoring and discipline they faced for not meeting quotas exacerbated that harm.

11.     While working at the direction of ByteDance, Plaintiffs and other content moderators witness many acts of extreme and graphic violence as described above. As just a few examples, Plaintiff Young saw a thirteen-year-old child being executed by cartel members, bestiality and other traumatizing content. Plaintiff Velez saw bestiality and necrophilia, violence against children and other traumatizing content. Neither of these Plaintiffs were properly warned by TikTok of what they would see, either in training materials or in any other way. The actual content they saw was shocking, disturbing and harmful, in contrast to suggestions before they began work that content would be relatively mild. As a result of their repeated, unmitigated, and unprotected exposure to harmful conduct through Defendants' conduct, including its imposition of quotas, Plaintiffs have suffered injuries.

12.     Content moderators also face repeated exposure to conspiracy theories, including but not limited to suggestions that the COVID-19 pandemic is a fraud, genocide deniers, false flag stories and other damaging distortions of present events and historical events, "challenges" that involve high-risk behavior, fringe beliefs, hate speech, and political disinformation about census participation, candidate citizenship status or eligibility for public office, and manipulated videos of elected officials. This type of content can and does cause traumatic reactions. The last category was particularly damaging during the 2020 election and its immediate aftermath, and harm from videos being uploaded then is being compounded by the present public discussion around the events of January 6, 2021 and the recent midterm elections and upcoming 2024 elections.

13.     As a result of constant and unmitigated exposure to highly toxic and extremely disturbing images at the workplace, punishing quotas pushed by Defendants, and inexcusably poor training and guidance provided exclusively by Defendants, Plaintiffs and other content moderators suffer immense stress and psychological harm. Plaintiffs have sought counseling on their own time and effort due to the content they were exposed to while providing content moderation services for TikTok because they are not provided adequate prophylactic measures before exposure nor appropriate ameliorative measures after exposure. Plaintiffs and other content moderators are now at increased risk of developing psychological harms due to the repeated traumatic viewing they endure at their job without adequate

protection, training, and care. Defendants further exacerbate these harms by pushing unreasonable productivity standards on content moderators.

14.     Defendants are aware of the negative psychological effects that viewing graphic and objectionable content has on content moderators. Defendants are aware of ways to mitigate the risk of harm and to ameliorate the harm that is caused. Despite this knowledge, Defendants have not implemented acknowledged standards of care to protect content moderators from harm, including standards of care they have publicly endorsed.

15.     To the contrary, Defendants impose productivity standards and quotas on their content moderators that are irreconcilable with applicable standards of care.

16.     Despite increasing scrutiny on the lack of adequate care provided to content moderators from both the media and the general public, Defendants not only have caused harm to content moderators through their affirmative conduct, but have exacerbated that conduct by diminishing mental health concerns of content moderators, treating these people like the human wreckage of their business model.

17.     Even though Defendants have control over the material aspects of Plaintiff's work conditions as alleged in this Second Amended Complaint, by failing to implement acknowledged best practices to mitigate risks necessarily caused by such work, TikTok violates California law. Furthermore, by requiring non-disclosure agreements, Defendants cause harm to content moderators by forcing them to keep inside the horrific things they see while reviewing content for Defendants.

18.     Without this Court's intervention, Defendants will continue to breach the duties they owe to and injure and cause serious harm to content moderators.

19.     On behalf of themselves and all others similarly situated, Plaintiffs bring this action (1) to provide remedies to content moderators who were exposed to graphic and objectionable content on behalf of TikTok; (2) to ensure that Defendants provide content moderators with tools, systems, and mandatory ongoing mental health support to mitigate the harm reviewing graphic and objectionable content can cause; and (3) to provide mental health screening and treatment to the thousands of current and former content moderators affected by Defendants' unlawful practices.

## II.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) and 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class, including Plaintiffs, are citizens of states different from some Defendants.

21.     This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and purposely availed themselves of the laws of the United States. Defendant ByteDance is headquartered in this District and regularly conducts business here.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Defendant ByteDance transacts business, maintains substantial contacts, and committed tortious acts in this District, causing injury to persons residing in, located in, or doing business throughout the United States. Defendant ByteDance is headquartered in Mountain View, in this District, and conducts substantial business activities here. Plaintiffs and the proposed class have been, and continue to be, injured as a result of Defendant ByteDance's illegal conduct in the Northern District of California.

## III.     PARTIES

23.     Plaintiff Reece Young is a resident of Nashville, Tennessee. For approximately 11 months, starting in 2021, Plaintiff Young worked as a content moderator reviewing content for TikTok. He did this at home, using software provided by TikTok.

24.     Plaintiff Ashley Velez is a resident of Las Vegas, Nevada. Starting in May 2021 and up to November 2021, Plaintiff Velez worked as a content moderator reviewing content for ByteDance. She

did this at home, using software provided by TikTok. Plaintiff Velez is not subject to any arbitration agreement applicable to the claims made herein.

25.     Defendant ByteDance is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California.

26.     Defendant TikTok is, and at all relevant times was, a California corporation with its principal place of business at 5800 Bristol Pkwy, Culver City, Los Angeles County, California. Defendant TikTok also maintains offices in Palo Alto, California and Mountain View, California. TikTok is owned by ByteDance.

27.     In fiscal year 2020, ByteDance made approximately $34.3 billion in advertising revenue. In 2019, that number was $17 billion, and in 2018 that number was $7.4 billion. ByteDance accomplished this in large part due to the popularity of its App. TikTok is a booming social media platform that allows posting of videos.

28.     According to a November 5, 2019, article in *The Washington Post*, "[t]he short-video app has become a global phenomenon and has taken young American audiences by storm, blending silly jokes, stunts and personal stories into a tech powerhouse downloaded more than 1.3 billion times worldwide."

29.     To generate this content, ByteDance relies on users to upload videos to its platform. TikTok users spend almost an hour on average a day on the App, with younger individuals spending even more time on the App.

30.     The amount of content on TikTok is massive, with TikTok having more than a billion videos viewed on its platform each day and millions of active users.

### IV.     FACTUAL ALLEGATIONS

**A.     Content moderators are required to watch hundreds or thousands of videos each day, while being constantly monitored and evaluated by Defendants.**

31.     Defendants rely on users to report inappropriate content. Defendants receive millions of user reports of potentially objectionable content on the App. These videos are then flagged for review by content moderators to determine if the content violates Defendants' policies. Human moderators

review the reported content – sometimes thousands of videos and images every shift – and remove videos that violate Defendants' terms of use, with posts often containing graphic content.

32.   Plaintiffs, and other content moderators, review content through TikTok's proprietary TCS software. Plaintiffs would spend their days watching graphic content, often multiple videos at a time to meet speed quotas, while being monitored through the TCS software.

33.   Plaintiffs, and other content moderators, would be required to test their accuracy in flagging content against results obtained by other moderators. This would include weekly quizzes administered by Defendants. Moderators are expected, in addition to reviewing a staggering amount of videos per day and to achieve accuracy rates of up to 90%. Punishment followed failure to meet the accuracy requirements. All of this was imposed by Defendants and enforced by Defendants. Plaintiffs' ostensible employers were simply messengers for Defendants.

34.   While efforts are being made to use artificial intelligence to do the work that content moderators have done, these efforts have been met with little success. AI has been spotty and no substitute for the human moderators that Defendants rely on.

35.   Defendants force moderators to meet extreme quotas on the number of videos they review. Moderators have reported quotas of up to 1000 videos a day and have exceedingly little time to work with the videos and manage their reactions. Moderators are further required to view the videos at extreme speeds, while preserving accuracy in flagging the videos with the appropriate tags, which change on a daily basis. This can result in moderators being required to view 1000 videos a day, with only 15 seconds to review each video, while still maintaining accuracy based on constantly changing criteria.[1] All of this is imposed by Defendants, and it causes damage to Plaintiffs and the proposed class.

36.   Upon receiving a report from a user about inappropriate content, Defendants send that video to two content moderators, who review the videos and determine if the video should remain on the platform, be removed from the platform, or have its audio muted.

---

[1] Niamh McIntyre, Rosie Bradbury, Billy Perrigo, *Behind TikTok's Boom: A Legion of Traumatised, $10-A-Day Content Moderators, Bureau of Investigative Journalism* (Oct. 10, 2022) https://www.thebureauinvestigates.com/stories/2022-10-20/behind-tiktoks-boom-a-legion-of-traumatised-10-a-day-content-moderators

37.     Plaintiffs, and other content moderators, do all their work through Defendants' proprietary TCS software.  It is through TCS that videos are sent to the content moderators, specifically in the form of "queues" which contain a series of videos to review. The TCS software also provides the tools for viewing and flagging videos that are reviewed. Defendants' TCS software is the sole way that Plaintiffs and members of the proposed class do their jobs.  Defendants' TCS software only exists to further Defendants' business; it is not used by any other business.

38.     Plaintiffs and other moderators have their work flagged for review by moderators from TikTok to check for accuracy. Thus, daily Plaintiffs and others are supervised by TikTok personnel and take direction from them to accomplish their daily tasks, including those that cause harm to content moderators.

39.     As Plaintiffs, and other content moderators work, they are constantly surveilled by Defendants through their proprietary TCS software and subject to almost immediate discipline from unknown people in another country who are watching them work and pushing them to work harder than they are able to safely work.

40.     The TCS software, beyond being the sole means for Plaintiffs and other content moderators to review content for Defendants, constantly tracks and watches Plaintiffs and other content moderators.

41.     The TCS software will flag any time a content moderator spends away from reviewing videos, allowing Defendants to condition payment, push speed quotas, and otherwise control the daily work of content moderators as they are under constant surveillance. This means of enforcing the already harmful quotas is an additional harm that Defendants directly cause to Plaintiffs and the proposed class.

42.     The entire work of content moderation occurs through the TCS software. Flags and tags attributed to the videos are done through the TCS software, and the TCS software is how the content moderators view the videos. TCS is also used by Defendants to constantly monitor the content moderators. The TCS software allows Defendants to watch everything that the content moderators do while they are logged in, and also allows Defendants to determine exactly how long a content moderator

is logged out during lunch or breaks. Both Plaintiffs used this software to do their jobs reviewing TikTok content.

43.     Defendants recognize the dangers of exposing users to images and videos of graphic violence. In December 2020, TikTok updated its community guidelines, available at https://newsroom.tiktok.com/en-us/refreshing-our-policies-to-support-community-well-being, to foster well-being on its platform to address distressing content like suicide and self-harm.

**B.      Defendants control the means and manner by which content moderation is done and enforce harmful quotas.**

44.     Plaintiff Velez was hired by Telus. Plaintiff Velez only performed content moderation services for TikTok while employed by Telus. Plaintiff Velez used Defendants' TCS to perform content review for TikTok while employed by Telus.

45.     Plaintiff Young was hired by Atrium. Plaintiff Young only performed content moderation services for TikTok while employed by Atrium. Plaintiff Young used Defendants' TCS to perform content review for TikTok while employed by Atrium.

46.     Plaintiffs were trained directly with TikTok standards and were responsible for taking tests and learning materials provided by Defendants that would then be reviewed and evaluated by Defendants to determine if they were meeting Defendants' standards.

47.     Plaintiffs and other moderators were quizzed weekly at Defendants' behest, monitored by Defendants, and would be emailed if their flagging of videos and questionable content was deemed unworthy.

48.     Defendants sent daily updates to their flags for tagging videos. These updates directly instructed Plaintiffs and other moderators on how to do their daily tasks and controlled the minutia of how they reviewed content. Plaintiffs would frequently have to translate these instructions from Chinese to English, using online apps. Plaintiffs' employers had no idea what was in these instructions. Following these instructions, which were wildly inconsistent, caused additional harm to Plaintiffs and other content moderators.

49.     Defendants oversee all content moderation through their U.S. Safety Team located in Los Angeles, California, as testified to by Vanessa Pappas, Chief Operating Officer, TikTok Inc., in the

September 14, 2022 hearing before the U.S. Senate Committee on Homeland Security and Governmental Affairs. Ms. Pappas stated that "Strong policies are insufficient if they are not enforced through constant attention by human moderators using modern tools. Content moderation policy and implementation for the United States is led by our U.S. Safety Team in Los Angeles, which reports to me."

50.     Content moderators report on having to use translation tools to understand and read materials provided by Defendants, specifically ByteDance, which were necessary for them to do their jobs.

51.     Defendants control over the content moderation process is further indicated in their attempts to discourage political dissent, bolster popular accounts, and continual updating of their community guidelines to determine what content is permissible on their site.

52.     Defendants have been reported to instruct moderators to suppress posts created by users who were deemed "too ugly, poor, or disabled for the platform," as reported by The Intercept.[2] Internal TikTok documents also show censorship for political discourse to prevent dissent. Defendants have shown they control what the content moderators flag and provide the sole guidance on what content to remove.

53.     Defendants withhold payment to content moderators if they are not on the TCS application beyond their allotted breaks (two fifteen-minute breaks and one hour-long lunch break for a twelve-hour workday), directly determining employee compensation. On information and belief, ByteDance and TikTok would threaten content moderators who did not meet time requirements with demotions to lower paid positions.

54.     This practice is further reflected in ByteDance and TikTok's overseas operations. In a report from the Bureau of Investigative Journalism, reporters found that workers who didn't meet goals could lose bonuses that were up to a quarter of their salary.

55.     ByteDance and TikTok provide the video queues for content moderators to work through, grouping and sending over flagged content for review. Content moderators are provided with

---

[2] Sam Biddle, Paulo Victor Ribeiro, Tatiana Dias, Invisible Censorship, (Mar. 15, 2022, 9:02 PM), https://theintercept.com/2020/03/16/tiktok-app-moderators-users-discrimination/.

queues of videos and content that dictate their day-to-day assignments. These queues provided to content moderators consist of their sole work assignments as content moderators. On information and belief, these queues were highly inaccurate, and graphic content frequently was in queues that were meant to exclude graphic content, providing moderators with no respite from seeing graphic content.

56.     ByteDance and TikTok provide the information on how many videos to review, how to review the videos, what content is considered to be actionable, and the tags that are placed on videos to indicate content. This includes changing directives as to what content is actionable and guidelines on how to properly use both the TCS proprietary software and how to generally approach content moderation. Content moderators report that such changes happened nearly daily, and that they are constantly receiving new instructions and directions directly from Defendants.

57.     Plaintiffs' and other content moderators' ostensible employers do little more than issue paychecks. Virtually every other aspect of these employees' jobs – particularly during and after Covid, when the majority of work has been done from home – has been affirmatively controlled by Defendants, including the harmful quotas that they impose on Plaintiffs and other content moderators.

**C.     Plaintiffs are daily subjected to traumatic content.**

58.     Content moderators are required to watch and view traumatic content daily, with their job being to see the most reprehensible and concerning content so as to shield it from the average TikTok user.

59.     While content moderators do an immense public service, Defendants push content moderators to watch as many videos as possible, exacerbating the harm to content moderators through punishing speed and accuracy quotas. Defendants are aware that their harsh requirements create an increased risk that content moderators will develop PTSD and related disorders. Still, despite knowing the harm they were causing, Defendants continued to institute harmful work conditions and failed to provide adequate services to content moderators, including Plaintiffs, to cope with the unbearable health concerns that are a result of Defendants' policies.

60.     If a content moderator wishes to step away to catch their breath after seeing a graphic video, whether sexual abuse, violence, or other traumatic content, they are out of luck. Content moderators are punished for time away from the TCS application, both by losing on their stringent speed metrics, risking a potential demotion to a lower pay bracket or bonuses that comprise a substantial part of their salary, and their ability to secure better shifts or time slots. Beyond penalizing moderators for any personal attempts to cope with the content they see, this constant monitoring and punishment scheme makes any of the meager wellness protections available illusory. Defendants withhold payment to content moderators if they are not on the TCS application beyond their allotted two fifteen-minute breaks and a one-hour-long lunch break, directly determining employee compensation.

61.     Moderators were monitored directly by Defendants through the TCS software. If a content moderator does not perform to Defendants' standards, including meeting their unsafe quotas, they will be flagged for reprimand or further penalties and Defendants would instruct their third-party vendors to carry out such actions.

62.     On information and belief, content moderators were punished by having promotional opportunities denied, receiving the worst shift times, and having their pay withheld if they did not match speeds mandated by the Defendants. Content moderators were mandated by TikTok and ByteDance to review videos exceptionally quickly, with just a few seconds per video on average. If they took longer to determine if a video was against the guidelines, their metrics would suffer and they would be punished. Content moderators reported having to accept unfavorable shift time slots, lower pay, and loss of advancement opportunities if their time slipped from Defendants' imposed metrics.

63.     As these time pressures were intense, with up to 1000 videos being reviewed a day, Plaintiffs and other content moderators were at increased risk of injury. Due to the time pressures imposed by Defendants, content moderators felt unable to use the minimal therapeutic options provided by their employers and felt actively punished if they attempted to do so. Content moderators report pushback upon requesting wellness appointments with company-offered perks, orders to make up any time lost to counseling, and difficulty in even managing to schedule appointments. The limited time offered by Defendants for wellness, besides proving ineffective, was actively undermined and

diminished by Defendants making the promise of care illusory. All of this was because of the quotas imposed by Defendants.

64.     This includes any attempts to use offered counseling services. Despite advertising wellness benefits, content moderators were unable to use these services without being penalized for failing to keep up with the unreasonable pace demanded by Defendants. Content moderators were actively encouraged to ignore their mental health and view as many videos as possible in as short amount of time as possible, and if they did not comply, they were punished by Defendants.

65.     Other benefits contract moderators were offered had to be used outside of company time and had no relation to the stress and risks of their work. These included meditation apps, cooking classes, and similar offers. At no point did Defendants offer additional training for handling sensitive content.

66.     Defendants have also retaliated against content moderators who attempt to raise concerns and seek redress for the dangerous conditions they are required to work under.

67.     In December of 2021, a case was filed in the Central District of California entitled, *Frazier v. Byte Dance Inc., and TikTok Inc.*, No. 2:21-cv-9913, (2021) seeking redress for content moderators due to their injuries suffered due to the negligence of Defendants while reviewing traumatic content on their behalf. In response, Defendants caused the Plaintiff to be fired from her job, on Christmas Eve. Because of this conduct by Defendants, that case did not go forward and no decision was ever reached as to the merits of the claims in that action. Defendants used their power to effectively chill this attempt by a content moderator to blow the whistle on unsafe working conditions, sending a chill throughout their remaining workforce of content moderators.

68.     Speed metrics and pressure to get through video quotas were directly imposed by Defendants, with Defendants conditioning pay based on speed and providing the tags and metrics used in their proprietary TCS software that dictated how content moderators viewed and reviewed videos.

69.     In addition to failing to provide any wellness help, Defendants continuously increased the workload on content moderators by increasing the number of tags attributed to videos and increasing the specificity of review.

70.     This adding of tags was done nearly every day. Defendants were constantly sending updates to content moderators changing how they review the content and what to look for in each video.

71.     At all times relevant to this complaint, ByteDance was a client of Telus

72.     At all times relevant to this complaint, ByteDance was a client of Atrium.

73.     During their employment as content moderators, Plaintiffs and content moderators are exposed to endless graphic and objectionable videos, graphic violence, sexual assault, and child pornography. For example, Plaintiffs witnessed videos of bestiality, violence against minors, suicide, and executions

74.     PTSD and related syndromes caused by exposure to harmful content can be triggered by witnessing abuse; watching the news or seeing violence on television; hearing loud noises like gunshots, fireworks, cars backfiring, or objects falling; seeing terrorists like ISIS members or related paraphernalia; and seeing racially discordant posts sowing political dissension in America. Plaintiffs and content moderators are highly susceptible to increased rates of PTSD and related syndromes due to the content they are required to view.

75.     Despite being aware of the harms of exposure to graphic content, Defendants continue to push for speed over safety and penalize workers who attempt to protect their mental health

**D.     Repeated exposure to graphic imagery can cause devastating psychological trauma, including PTSD, anxiety, and depression.**

76.     Plaintiffs and other content moderators spent their days repeatedly watching videos that contained intense graphic violence, sexual abuse, and other traumatic content without proper safeguards due to the control and pressure exerted on content moderators by Defendants. The unsafe quotas imposed by Defendants caused harm to the Plaintiffs.

77.     It is well known that exposure to images of graphic violence can cause debilitating injuries, including Post Traumatic Stress Disorder ("PTSD"), anxiety and depression.

78.     Whereas viewing or hearing about another person's traumatic event used to be considered "secondary traumatic stress," the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 5th ed. 2013) ("DSM-5") recognizes that secondary or indirect

exposure to trauma, such as repeated or extreme exposure to aversive details of trauma through work-related media, meets the first diagnostic criterion for PTSD.

79.     In a study conducted by the National Crime Squad in the United Kingdom, seventy-six percent of law enforcement officers surveyed reported feeling emotional distress in response to exposure to child abuse on the internet. The same study, which was co-sponsored by the United Kingdom's Association of Chief Police Officers, recommended that law enforcement agencies implement employee support programs to help officers manage the traumatic effects of exposure to child pornography.

80.     In a study of 600 employees of the Department of Justice's Internet Crimes Against Children task force, the U.S. Marshals Service found that a quarter of the cybercrime investigators surveyed displayed symptoms of psychological trauma, including secondary traumatic stress.

81.     Another study of cybercrime investigators from 2010 found that "greater exposure to disturbing media was related to higher levels of . . . secondary traumatic stress" and that "substantial percentages" of investigators exposed to disturbing media "reported poor psychological well-being."

82.     The Eyewitness Media Hub has also studied the effects of viewing videos of graphic violence, including suicide bombing, and found that "40 percent of survey respondents said that viewing distressing eyewitness media has had a negative impact on their personal lives."

83.     While there is no way to eliminate the risk created by exposure to graphic and objectionable content, there are ways to mitigate it. It is known that especially demanding job requirements or a lack of social support reduce resilience in the face of trauma exposure and increase the risk of developing debilitating psychological symptoms.

84.     Content moderators are of increasing concern to the medical community for PTSD and similar injury resulting from the review of graphic content. This is reflected in numerous media articles and suggestions for best practices throughout the industry aimed at protecting moderators' health.

85.     Depending on many factors, individuals who have experienced psychological trauma may develop a range of subtle to significant physical and psychological symptoms, including extreme fatigue, dissociation, difficulty sleeping, excessive weight gain, anxiety, nausea and other digestive issues.

86.     PTSD symptoms may manifest soon after the traumatic experiences, or they may manifest later, sometimes months or years after trauma exposure. The Americans with Disabilities Act recognizes that certain diseases can manifest into disabilities and describes PTSD as a "hidden disability" on its website: https://www.ada.gov/servicemembers_adainfo.html.

87.     Trauma exposure and PTSD are also associated with increased risk of chronic health problems, including cardiovascular conditions, pain syndromes, diabetes, and dementia.

88.     There is growing evidence that early identification and treatment of PTSD is important from a physical health perspective, as several meta-analyses have shown increased risk of cardiovascular, metabolic, and musculoskeletal disorders among patients with long-term PTSD.

89.     Psychological trauma and PTSD are also often associated with the onset or worsening of substance use disorders. Epidemiologic studies indicate that one-third to one-half of individuals with PTSD also have a substance use disorder. Compared to individuals without PTSD, those with PTSD have been shown to be more than twice as likely to meet the diagnostic criteria for alcohol abuse or dependence; individuals with PTSD are also three to four times more likely to meet the diagnostic criteria for drug abuse or dependence.

90.     An individual's risk of developing PTSD or associated symptoms may be reduced through prevention measures, categorized as primary, secondary, and tertiary interventions. Primary interventions are designed to increase resilience and lower the risk of future PTSD among the general population. Secondary interventions are designed to lower the risk of PTSD among individuals who have been exposed to trauma, even if they are not yet showing symptoms of traumatic stress. Finally, tertiary interventions are designed to prevent the worsening of symptoms and improve functioning in individuals who are already displaying symptoms of traumatic stress or who have been diagnosed with PTSD.

91.     Individuals who develop PTSD or other mental health conditions following traumatic exposure require preventative measures as well as treatment. Unlike prevention, treatment measures are aimed at symptom resolution and recovery from the disorder.

92.     Preliminary screening is necessary to determine the types of prevention or treatment measures most appropriate for an individual.

**E.**     **Defendants did not meet accepted industry standards for mitigating the harm to content moderators.**

93.     Defendants are and were aware of the damage that disturbing imagery could have on content moderators. Through the App, they are members of the Technology Coalition, which was created "to develop technology solutions to disrupt the ability to use the Internet to exploit children or distribute child pornography." In short, Defendants are hypocritical members of the group that provides industry standards and advocates for increased protections.

94.     Other members of the Technology Coalition include Facebook, YouTube, Snap Inc. and Google, all firms with similar content moderation challenges. Facebook and YouTube have both changed their practices when content moderators brought similar claims against them.

95.     In January 2015, the Technology Coalition published an "Employee Resilience Guidebook for Handling Child Sex Abuse Images" (the "Guidebook").

96.     According to the Guidebook, the technology industry "must support those employees who are the front line of this battle."

97.     The Guidebook recommends that internet companies implement a robust, formal "resilience" program to support content moderators' well-being and mitigate the effects of exposure to trauma-inducing imagery.

98.     With respect to hiring content moderators, the Guidebook recommends:

a.     In an informational interview, "[u]se industry terms like 'child sexual abuse imagery' and 'online child sexual exploitation' to describe subject matter";

b.     In an informational interview, "[e]ncourage candidate to go to websites [like the National Center for Missing and Exploited Children] to learn about the problem";

c.     In follow-up interviews, "[d]iscuss candidate's previous experience/knowledge with this type of content";

d.     In follow-up interviews, "[d]iscuss candidate's current level of comfort after learning more about the subject";

e.     In follow-up interviews, "[a]llow candidate to talk with employees who handle content about their experience, coping methods, etc."; and

f.   In follow-up interviews, "[b]e sure to discuss any voluntary and/or mandatory counseling programs that will be provided if candidate is hired."

99.   With respect to safety on the job, the Guidebook recommends:

a.   Limiting the amount of time an employee is exposed to child sexual abuse imagery;

b.   Teaching moderators how to assess their own reaction to the images;

c.   Performing a controlled content exposure during the first week of employment with a seasoned team member and providing follow-up counseling sessions to the new employee;

d.   Providing mandatory group and individual counseling sessions administered by a professional with specialized training in trauma intervention; and

e.   Permitting moderators to "opt-out" from viewing child sexual abuse imagery.

100.   The Technology Coalition also recommends the following practices for minimizing exposure to graphic content:

a.   Limiting time spent viewing disturbing media to "no more than four consecutive hours";

b.   "Encouraging switching to other projects, which will allow professionals to get relief from viewing images and come back recharged and refreshed";

c.   Using "industry-shared hashes to more easily detect and report [content] and, in turn, limit employee exposure to these images. Hash technology allows for identification of exactly the same image previously seen and identified as objectionable";

d.   Preventing content moderators from viewing child pornography one hour or less before they end their workday; and

e.   Permitting content moderators to take time off as a response to trauma.

101.   According to the Technology Coalition, if a company contracts with a third-party vendor to perform duties that may bring vendor employees in contact with graphic content, the company should clearly outline procedures to limit unnecessary exposure and should perform an initial audit of

the independent contractor's wellness procedures for its employees. The experiences of Plaintiffs and other content moderators strongly suggest that Defendants have not done this.

102.    Plaintiffs and other content moderators are forced to perform their work through the TCS software, which monitors them for any time away from reviewing material. Thus, Plaintiffs and other content moderators are unable to switch or limit their time viewing graphic materials.

103.    Plaintiffs and other content moderators further are unable to control any of the content they see. Plaintiffs and other content moderators report that Defendants will arrange videos in queues prior to review. Despite any labeling, Plaintiffs and other content moderators continue to receive graphic content in queues that are supposed to not contain graphic material. Due to Defendants' lack of proper sorting of the queues, Plaintiffs and other content moderators are not able to switch to other projects that allow for them to refresh, are not allowed to opt out of graphic content after four consecutive hours and are unable to limit viewing of child pornography one hour or less than before they end their workday.  This causes harm to Plaintiffs and content moderators.

104.    The National Center for Missing and Exploited Children ("NCMEC") also promulgates guidelines for protecting content moderators from psychological trauma. For instance, NCMEC recommends changing the color or resolution of the image, superimposing a grid over the image, changing the direction of the image, blurring portions of the image, reducing the size of the image and muting audio.

105.    Based on these industry standards, various internet companies take steps to minimize harm to content moderators. Some notable measures include the use of filtering technology to distort images, and the provision of mandatory psychological counseling for content moderators.

106.    Defendants failed to implement the aforementioned standards as a member of the Technology Coalition. Instead, Defendants impose productivity standards and daily work quotas on their content moderators that are irreconcilable with applicable standards of care and push content moderators past reasonable limits, causing harm to their content moderators.

107.    For example, Defendants claim that content moderators could opt out of viewing child pornography content. However, on information and belief, such promises proved illusory. Even labeled queues, that were supposed to contain less graphic information, were commonly filled with a mix of

materials, including the supposedly excluded graphic content. Plaintiffs and other content moderators report that any labeled queues were frequently contaminated with supposedly excluded content, and they could not trust the queues to not contain graphic and traumatic imagery, causing harm.

108.    Defendants also fully controlled the training and guidance that was provided to content moderators to conduct their work. Defendants provided the instructions, training manuals, and would provide updates to the review policies.

109.    Through this control, Defendants failed to provide the tools for content moderators to handle the work they were given, including not providing the pre-screening interview questions that the Technology Coalition recommends to prevent harm.

110.    Offered counseling was not focused on the traumatic nature of the work, and instead focused on unrelated topics or included benefits such as a meditation app, cooking classes, and no specific time set aside for content moderators to utilize these resources.

111.    Defendants thus did not provide the technological safeguards, did not follow proper guidance on how to train moderators, and did not conform to industry standards that they themselves helped write to protect content moderators from the graphic content they were required to see.

112.    Defendants' actions and failure to act, as set forth in this Amended Complaint, resulted in Plaintiffs and other content moderators being exposed to unsafe quotas of videos which included a relentless stream of graphic and objectionable videos, including violence, sexual assault, and child pornography. Incidentally, this harmful exposure to child pornography and similar imagery is the kind of harm that the Guidebook mandates to prevent or mitigate as provided in paragraphs 99 (a) through (e) and 100 (a) through (e) of this Complaint.

113.    As a result of constant and unmitigated exposure to highly toxic and extremely disturbing images at the workplace, content moderators, including Plaintiffs, have suffered immense stress and psychological harm. Furthermore, the lack of adequate prophylactic measures and the lack of counseling services and/or ameliorative measures has led Plaintiffs to seek counseling on their own time and effort.

**F.      Defendants fail to implement meaningful protections for their content moderators.**

114.    Defendants failed to implement workplace safety measures that meet industry standards that other companies and non-profits have implemented and have failed as well to implement the standards suggested by the Technology Coalition, despite being a member.

115.    All content moderation training is done at the direction of Defendants, with training being based on Defendants' materials and tailored to utilizing Defendants' proprietary software.

116.    All instructional materials and training materials are provided by Defendants. Plaintiffs and other content moderators even report on frequently having to translate through online applications and google searches from Chinese to English to understand the tasks they were given. All content moderation occurred through the TCS software, and Defendants were the sole instructors for how to operate the TCS software and implement TikTok guidelines, guidelines that changed daily.

117.    During the hiring and training process, Defendants do not inform content moderators about the nature of the work or the effect reviewing graphic content can have on their mental health. Potential hires are not asked about their previous experience with graphic content. Neither are they told that this content can have a significant negative mental health impact. Content moderators are not permitted to preview the graphic content or advised to seek out other outside information during the hiring process.

118.    In addition to this, content moderators are not trained on how to address the reactions they are going to have to the images they are going to see. Content moderators do not ease into their jobs through controlled exposure to graphic content with a seasoned team member, followed by counseling sessions. Despite sending daily updates on what content to flag, and in what way, Defendants provide no training on how to address their personal reactions to the content they review, leaving content moderators ill-equipped to handle the risks of the job and resulting in harm.

119.    Training videos were significantly tamer than what Plaintiffs were exposed to while on the job, leaving them unprepared for the mental stress and harm that they would be subjected to, exacerbating the risk of harm to content moderators.

120.    Defendants' training materials, thus, are woefully inadequate in light of the standards of the industry, standards Defendants themselves helped write.

121.    Before content moderators begin work, they are required to sign non-disclosure agreements. Only after these documents are signed does the training begin. Those non-disclosure agreements are required by Defendants, and those agreements cause harm to Plaintiffs and content moderators by forcing them to bottle up inside imagery too horrific to keep inside.

122.    Defendants also failed to provide safeguards known to mitigate the negative effects of reviewing graphic content.

123.    Content moderators are required to review hundreds of graphic and disturbing videos each week. To determine whether a video should be removed, Defendants create and continually revise tags for content that content moderators must use to determine whether flagged content violates Defendants' policies. Defendants recently increased the number of "tags" content moderators must use while moderating videos from 20 to 100. Content moderators are now expected not just to review the content of the video, but review video backgrounds and other aspects of the video to make sure they conform to Defendants' rules while trying to meet oppressive quotas.

124.    Defendants also impose strict quantity and accuracy quotas on content moderators. Content moderators are required to review videos for extremely short periods, just 15 seconds in some cases, and expected to have an accuracy rate of up to 95%. Content moderators often review multiple videos at the same time in order to meet the quotas. While all of this is happening, they are being continuously surveilled and pushed by Defendants' TCS software to review videos with little to no relief. Any breaks, even as small as a couple minutes, will be flagged by the TCS software and reflected in performance evaluation of the moderator.

125.    Defendants control how the videos are displayed (e.g., full screen versus thumbnails, blurred versus unblurred, etc.), how the accompanying audio is broadcasted, and whether videos begin automatically upon completion of the prior video or whether the content moderator can catch his or her breath by controlling the start of the ensuing video. This is done through Defendants' proprietary TCS software that is used by the content moderators. Despite their awareness of the impact of reviewing graphic content, Defendants fail to implement well-accepted standards to mitigate harm to content moderators. Defendants could have, but failed to, implement safeguards on their content moderation tools—including changing the color or resolution of the video, superimposing a grid over the video,

changing the direction of the video, blurring portions of the video, reducing the size of the video, and muting audio—that could mitigate some of the harm caused by reviewing graphic and disturbing content. This is also an acknowledged standard of care which Defendants have failed, and this failure has caused Plaintiffs' injuries.

126.    Content moderators, including Plaintiffs, conducted all their work on the TCS software owned and controlled by Defendants. There is no part of the content review process that is not conducted through the TCS software.

127.    This failure is especially glaring considering the reasonably uncomplicated nature of many of the tool-related changes. Defendants have full control over the TCS software. Blurring images and videos and providing tags for ultra-graphic violence would take little time to implement and could provide significant benefits to the health and safety of content moderators.

128.    Defendants also fail to provide appropriate psychological support to content moderators. Defendants purportedly offered content moderators "wellness" benefits, including specified wellness time. However, Defendants' public claims about industry-leading "wellness benefits" ring hollow as Defendants repeatedly reduced wellness time from one hour a week to thirty minutes a week.

129.    Defendants also affirmatively made using wellness benefits difficult and inefficient for moderators. Besides lowering the time of the wellness benefits, Defendants did not allow moderators to take the wellness benefits without hurting their job performance. Moderators who attempted to utilize the benefits were informed by supervisors that they would have to use their lunch hours or find other time to satisfy Defendants' speed quotas. Attempting to use the offered wellness benefits was undermined by Defendants' active efforts to push faster and faster times for content review and higher and higher quotas without regard for the impact on content moderators.

130.    The benefits offered to content moderators are only token efforts as opposed to meaningful counseling. Content moderators report that the sessions are too short for meaningful engagement, barely getting past the opening introductions before being called short. Offered benefits include meditation apps, cooking classes, and other benefits with no tie to mental health or care. Content moderators further report the counseling is not focused on the risks of the job or resultant

increase in potential for trauma. Instead, counseling is focused on unrelated topics and does not provide meaningful tools for content moderators to handle safely their demanding profession.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiffs bring this class action on behalf of themselves, and all others similarly situated pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All individuals in the United States that performed content moderation work for or in relation to ByteDance's TikTok application at any time until the present.

132.    The Class definition specifically excludes the following persons or entities:

    a.   any of the Defendants named herein;

    b.   any of Defendants' parent companies, subsidiaries, and affiliates;

    c.   any of Defendants' officers, directors, management, employees, or agents;

    d.   all governmental entities;

    e.   the judges and chambers staff in this case, as well as any members of their immediate families; and

    f.   any content moderators that are employed directly by Defendant.

133.    The class is so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact size of the class since that information is within the control of Defendants. However, upon information and belief, Plaintiffs allege that the number of class members is in the thousands. Membership in the class is readily ascertainable from Defendants' records as no one can perform content moderation for TikTok unless logged into the TCS system. On information and belief, Defendants maintain records of all activity that takes place on the TCS system and can ascertain the number and identities of class members.

134.    The claims asserted by Plaintiffs are typical of the proposed class's claims in that the representative Plaintiffs, like all class members, were exposed to highly toxic, unsafe, and injurious content while providing content moderation services for TikTok. Each member of the proposed class has been similarly injured by TikTok's misconduct.

135.     There are numerous questions of law or fact common to the class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

a.   whether Defendants committed the violations of the law alleged herein;

b.   whether the affirmative conduct of Defendants was a substantial factor in causing harm to Plaintiffs' and the class;

c.   whether Plaintiffs and the class are entitled to medical screening, treatment and damages; and

d.   whether Defendants should be ordered to implement and comply with industry guidelines for safety in content moderation.

136.     Plaintiffs will fairly and adequately represent the proposed class and protect the interests of the proposed class. Plaintiffs have retained attorneys experienced in class actions, complex litigation, the applicable law, PTSD and issues involving content moderation. Plaintiffs intend to vigorously prosecute this litigation. Neither Plaintiffs nor their counsel have interests that conflict with the interests of other class members.

137.     Plaintiffs and the proposed class members have all suffered and continue to suffer ongoing harm resulting from Defendants' wrongful conduct.

138.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This action likely presents no difficulties in management that would preclude maintenance as a class action.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

139.     Plaintiffs reallege and incorporate by reference herein all allegations above.

140.     The hirer of an independent contractor is liable to an employee of the contractor insofar

as the hirer's negligent exercise of retained control affirmatively contributed to the employee's injuries.

141.    If an entity hires an independent contractor to complete work but retains control over any part of the work, the hiring entity has a duty to the independent contractor's employees or subcontractors to exercise that control with reasonable care.

142.    If the hiring entity negligently exercises its retained control in a manner that affirmatively contributes to the injuries of the contractor's employees or subcontractors, the hiring entity is liable for those injuries.

143.    At all times relevant to the allegations herein, Plaintiffs and class members were employees or subcontractors of independent contractors hired by Defendants to moderate content on TikTok.

144.    Defendants retained control over certain aspects of the work performed by Plaintiffs and the class, including but not limited to:

   a.  Requiring content moderators to use Defendants' proprietary TCS software that presented unmitigated traumatic and harmful content to Plaintiffs without any adequate safeguards or mitigating care;

   b.  Imposing quotas that were unsafe and which caused harm to Plaintiffs;

   c.  Requiring that content moderators sign NDAs and undergo Defendants'-developed confidentiality trainings that prohibit content moderators from discussing their work outside their review teams in the absence of any mitigating measures for the serious harm caused;

   d.  Constantly surveilling the content moderation work being performed and the speed of review by content moderators;

   e.  Requiring that content moderators be sent daily adherence letters and weekly calibration tests;

   f.  Quizzing and evaluating content moderators on their performance;

   g.  Updating the conditions of the work, specifically the implementation of tags, daily;

   h.  Requiring that content moderators be interviewed and undergo training using training materials and procedures exclusively created by Defendants; and

        i.   Setting unrealistic and onerous work quotas and time demands.

145.    The aforementioned list of duties shows that Defendants did not merely exert general control over aspects of work, but rather, maintained and exercised retained control over Plaintiffs' work conditions at all times. Based on its exercise of retained control, Defendants have had at all relevant times a duty to exercise reasonable care with regard to the safety of Plaintiffs and the class.

146.    Defendants negligently exercised their retained control and, as a result, affirmatively contributed to the creation and persistence of the harm to Plaintiffs at their workplace. Such acts were done in a manner that affirmatively contributed to the injuries of Plaintiffs and the class, including by exacerbating Plaintiffs' and class members' risks of developing PTSD or other health issues. For example:

       a.   Defendants increased quotas and demands to unreasonable and harmful levels;

       b.   Defendants failed to provide adequate technological safeguards to protect content moderators from risks associated with exposure to traumatic content via their TCS software;

       c.   Defendants affirmatively punish content moderators for taking breaks during shifts and fail to mitigate harm to content moderators with any protective measures;

       d.   Defendants affirmatively control the tags used for reviewing content and update them frequently, changing the work conditions of content moderator constantly;

       e.   Defendants' NDAs and confidentiality requirements diminished content moderators' social support networks and resilience by prohibiting content moderators from speaking about the content they reviewed or other related workplace conditions to anyone outside of their review teams; and

       f.   Defendants failed to provide content moderators with an interview process and training that met industry standards for the mental health of prospective content moderators.

147.    Defendants were aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder and other forms of extreme violence.

148.    Defendants were also aware or should have been aware that the review technology they provided and mandated could be made safer if proper precautions were followed, that requiring content moderators not to discuss their work or workplace conditions reduced their ability to deal with traumatic content, and that Defendants' overall quality and quantity standards had the effect of imposing intense workplace stress and, accordingly, increasing content moderators' risk of injury from psychological trauma.

149.    Defendants breached their duty to Plaintiffs and the class by failing to provide the necessary and adequate technological safeguards, safety and instructional materials, warnings, social support, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through TCS.

150.    Defendants continue to breach their duty to class members by failing to exercise retained control with reasonable care, and that breach continues to elevate class members' risk of injury from psychological trauma.

151.    An entity that hires an independent contractor to complete work is liable to the independent contractor's employees or subcontractors if the hiring entity negligently provides unsafe equipment that affirmatively contributes to a workplace injury.

152.    Defendants provided to their independent contractors the review platform that Plaintiffs and the class were required to use to complete their work.

153.    Defendants had a duty to exercise reasonable care to furnish a safe review platform to their contractors.

154.    Defendants were aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through its review platforms.

155.    Defendants were aware or should have been aware that their review platforms could be made safer if proper precautions were followed.

156.    Defendants nevertheless provided unsafe review tools to Plaintiffs and the class that exposed Plaintiffs and the class to unmitigated traumatic content.

157.    Defendants breached their duty to Plaintiffs and the class by failing to provide necessary and adequate technological safeguards, safety and instructional materials, warnings, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through Defendants' review platforms.

158.    Defendants continue to breach their duty to class members by failing to provide a reasonably safe review platform; that breach continues to elevate class members' risk of injury from psychological trauma.

159.    Furthermore, Defendants continue to affirmatively contribute to the injuries of Plaintiffs and the class, including by exacerbating Plaintiffs' and class members' risks of developing PTSD or other health issues. This is done by punishing Plaintiffs for taking breaks during work to protect themselves from harms of their work, failing to follow the reasonable duty of care needed in such workplaces, and censuring Plaintiffs for not meeting impossible speed and daily work quotas.

160.    As a result of Defendants' tortious conduct, Plaintiffs and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

161.    To remedy that injury, Plaintiffs and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

162.    The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

163.    In particular, the medical monitoring regime includes: (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

164.     Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiffs and the class have incurred as a result of Defendants' unlawful conduct.

165.     Plaintiffs seek medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

166.     Plaintiffs also seek compensatory damages for the injuries they and the class have suffered.

167.     Plaintiffs also seek an award of attorney's fees.

## SECOND CAUSE OF ACTION
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW

168.     Plaintiffs reallege and incorporate by reference herein all allegations above.

169.     Defendants' negligent exercise of retained control of the content moderation work performed by Plaintiffs and the class violates California common law.

170.     Defendants' negligent provision of unsafe equipment and software to its independent contractors for use by Plaintiffs and the class in violation of California common law.

171.     Defendants' negligently provided inadequate training materials for use by plaintiffs and the class, also in violation of California common law.

172.     There were and are reasonably available alternatives to the conduct described herein that would further Defendants' legitimate business interests.

173.     Section 6400 of California's Labor Code requires employers to "furnish employment and a place of employment that is safe and healthful for the employees therein." Similarly, section 6401 requires every employer to "furnish and use safety devices and safeguards, and [to] adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful."

174.     To protect employees from unsafe workplaces, California law requires that "[e]very employer shall do every other thing reasonably necessary to protect the life, safety, and health of

employees." Cal. Labor Code § 6401. This includes "establish[ing], implement[ing], and maintain[ing] an effective injury prevention program." Cal. Labor Code § 6401.7. Employers must "provide and use safety devices and safeguards reasonably adequate to render the employment and place of employment safe," "adopt and use methods and processes reasonably adequate to render the employment and place of employment safe," and "do every other thing reasonably necessary to protect the life, safety, and health of employees." Cal. Labor Code § 6403.

175.    No employer can "require or permit any employee to go or be in any employment or place of employment which is not safe and healthful." Cal. Labor Code § 6402.

176.    Defendants fail to provide a safe working environment. Defendants routinely and repeatedly expose Plaintiffs and the class to content known to cause psychological trauma, including PTSD, anxiety and depression, even though Defendants know of and could reasonably implement adequate safety measures. Furthermore, Defendants continue to affirmatively contribute to the injuries of Plaintiffs and the class, including by exacerbating Plaintiffs' and class members' risks of developing PTSD or other health issues. This is done by punishing content moderators for taking breaks during work to protect themselves from harm of their work, failing to follow the reasonable duty of care needed in such workplaces, and censuring content moderators for not meeting impossible speed and daily work quotas.

177.    Defendants refused to implement necessary and adequate safety and instructional materials, trainings, warnings, and means to reduce and/or minimize the risks associated with exposure to graphic content.

178.    Defendants' failure to provide a safe workplace for Plaintiffs and the class violates, *inter alia*, sections 6400, 6401, 6401.7, 6402, and 6403 of the California Labor Code.

179.    In requiring content moderators to sign sweeping NDAs and instructing content moderators not to disclose information about working conditions—including the traumatic nature of the content, the intense stress from quantity and quality expectations, and the lack of training and safety measures to protect moderators from trauma exposure—Defendants further violate section 232.5 of the California Labor Code.

180.    Defendants' illegal conduct was and is willful and serious and has directly caused harm to Plaintiffs and the class.

181.    There are reasonably available alternatives to the conduct described herein that would further Defendants' legitimate business interests.

182.    Plaintiffs suffered an injury in fact because of Defendants' conduct, and it would not be possible to quantify this irreparable harm in the form of legal remedies. Any such quantification may render the remedy sought inadequate or incomplete.

183.    Defendants' failure to follow worker safety laws amounts to an unlawful, unfair, and fraudulent business practice under California Business and Professions Code section 17200.

184.    In the absence of any legal remedies, Plaintiffs seek an injunction creating a Defendants-funded medical monitoring program to facilitate the screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma, including preventing or mitigating conditions such as PTSD, anxiety, and depression. The program should include a fund to pay for the medical monitoring and treatment of Plaintiffs and the class as frequently and appropriately as necessary.

185.    Plaintiffs seek all appropriate injunctive relief pursuant to Business and Professions Code section 17203, including an order requiring Defendants to implement safety guidelines for all content moderators.

186.    Furthermore, a previous case filed against Defendants was voluntarily dismissed after the plaintiff, in that case, was terminated because she blew the whistle. Upon information and belief, Defendants played a role in that termination for the purpose of discouraging future whistleblowers from coming forward. In this context, Plaintiffs maintain that there is a need for injunctive relief.

187.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiffs and the class have incurred as a result of Defendants' unlawful conduct.

188.    Plaintiffs seek medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety and depression.

189.    Plaintiffs and the class will be irreparably harmed and/or denied an effective and

complete remedy if such an order is not granted.

190.   Plaintiffs also seek an award of attorney's fees.

## VI.   PRAYER FOR RELIEF

191.   WHEREFORE, Plaintiffs, individually and on behalf of the class, request that the Court:

a.   Certify this action as a class action with a class as defined above;

b.   Find that Plaintiffs are proper representatives of the class and appoint the undersigned as class counsel;

c.   Order Defendants to pay to notify class members of the pendency of this suit;

d.   Order Defendants to create a medical monitoring fund for the benefit of Plaintiffs and the class;

e.   Order Defendants to pay compensatory damages to Plaintiffs and the class;

f.   Award injunctive relief as is necessary to protect the interests of Plaintiffs and class members, including by enjoining Defendants from continuing to conduct business through the unlawful and unfair practices alleged herein, ordering Defendants to implement safety guidelines for all prospective content moderation operations, and ordering Defendants to establish a fund to pay for a medical monitoring program to facilitate the ongoing screening, diagnosis, and adequate treatment of Plaintiffs and the class for psychological trauma—including to prevent or mitigate conditions such as PTSD, anxiety and depression—until it can be determined that psychological trauma is no longer a threat to their health;

g.   Award Plaintiffs and class members their reasonable litigation expenses and attorneys' fees; and

h.   Award any further relief that this Court deems just and equitable.

## VII.   DEMAND FOR JURY TRIAL

192.   Plaintiffs hereby request trial by jury.

Dated:  November 9, 2022

Respectfully Submitted,

JOSEPH SAVERI LAW FIRM, LLP

By: _____

STEVEN N. WILLIAMS

Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Elissa A. Buchanan (SBN 2499960)
Abraham A. Maggard (SBN 339949)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swillliams@saverilawfirm.com
eabuchanan@saverilawfirm.com
amaggard@saverilawfirm.com

***Attorneys for Plaintiffs and the Proposed Class***