Steven N. Williams (SBN 175489)
Kai'Ree K. Howard (SBN 351730)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: 415-697-1507
Fax: 415-230-5310
Email:  swillliams@stevenwilliams.com
        khoward@stevenwilliams.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **REECE YOUNG** and **ASHLEY VELEZ**, individually and on behalf of all others similarly situated,<br><br>     *Plaintiff*,<br><br>  v.<br><br>**BYTEDANCE INC.**, and **TIKTOK INC.**,<br><br>     *Defendant*. | Civil Action No. 3:22-cv-01883-VC (LB)<br><br>**NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>**Date:  December 19, 2024**<br>**Time: 10:00 a.m.**<br>**Place: Courtroom 4, 17th Floor**<br>**Judge: Hon. Vince Chhabria** |

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that at 10:00 a.m. on December 19, 2024 at the United States District Court for the Northern District of California located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as soon thereafter as the matter may be heard, Plaintiff Reece Young will, and hereby does, move the Court for an order under Federal Rule of Civil Procedure 23 certifying a class and appointing lead counsel.

Plaintiff seeks to certify this class:

All people in the United States who performed content moderation work

(including Trainers and QAs) for TikTok between March 24, 2020 and the present and who were not directly employed by TikTok. Excluded from the proposed class are Defendants, Defendants' employees, and the Court and its staff.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Steven N. Williams ("Williams Decl."), the Declaration of Reece Young, the Declaration of Jazmyn Blake, the Declaration of Tomy Monzon, the Declaration and Expert Report of Sonya Norman, Ph.D., the Declaration and Expert Report of Patricia Watson, Ph.D., the Court's files and records in this matter, and any further matters the Court may consider.

Dated:  September 23, 2024               Respectfully Submitted,


                                        **STEVEN WILLIAMS LAW, P.C.**


                                        By:      /s/ Steven N. Williams
                                              Steven N. Williams


                                        Steven N. Williams (SBN 175489)
                                        Kai'Ree K. Howard (SBN 351730)
                                        **STEVEN WILLIAMS LAW, P.C.**
                                        201 Spear Street, Suite 1100
                                        San Francisco, California 94105
                                        Tel: 415-697-1509
                                        Fax: 415-230-5310
                                        swilliams@stevenwilliamslaw.com
                                        khoward@stevenwilliamslaw.com

## TABLE OF CONTENTS

**Introduction** ...............................................................................................1

**Statement of Issues to be Decided** ..............................................................2

**Background and Procedural History** ............................................................2

   Plaintiff's Claims...........................................................................................2

   Experiences of Content Moderators................................................................2

   Defendants' Business Model...........................................................................5

   Defendants Exercise Significant Control Over the Proposed Class Members............7

   Defendants' Knowledge of Risks....................................................................7

   Defendants Have Been Negligent in Exercising Their Retained Control .................12

   Plaintiff's Expert Opinions Support Class Certification ....................................12

**Legal Standard** ........................................................................................14

**Legal Argument** .......................................................................................16

   The Requirements for a Class Under Rule 23(a) Are Satisfied ...............................16

      The Proposed Class Meets the Numerosity Requirement .......................................16

      The Proposed Class Meets the Commonality Requirement .....................................16

      The Proposed Class Meets the Typicality Requirement.........................................17

      Plaintiff has, and will, Fairly and Adequately Protect the Interests of the Class .................18

   Certification is Appropriate Under 23(b)(2) ...................................................18

   Certification is Appropriate Under 23(b)(3) ...................................................20

      Common Questions Predominate ....................................................................20

      A Class Action is Superior .........................................................................20

**Conclusion** ..............................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Brown v. China Integrated Energy Inc.*, No. CV 11-02559-BRO (PLA), 2015 WL 12720322
(C.D. Cal. Feb. 17, 2015) .......................................................................................................... 20

*Calvasina v. Walmart Real Estate Business Trust*, 906 F. Supp.2d 625 (W.D. Tex. 2012)......... 16

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................................... 15

*Corvello v. Wells Fargo*, Case No. 10-cv-05072-VC, 2016 WL 3995909 (N.D. Cal. January 29,
2016) ........................................................................................................................................... 15

*Gates v. Pickett & Nelson Const. Co.,* 432 P.2d 780 (Idaho 1967) .............................................. 16

*Hanon v. Dataproducts Corp.,* 976 F.2d 497 (9th Cir. 1992)....................................................... 17

*Huebner v. Radaris, LLC,* Case No. 14-cv-04735-VC, 2016 WL 8114189 (N.D. Cal. April 12,
2016) ........................................................................................................................................... 15

*Lytle v. Nutramax Laboratories, Inc.,* Case No. 22-55744, ___ F.4th ___, 2024 WL 3915361 (9th
Cir. Aug. 23, 2024) .................................................................................................................... 15

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651(9th Cir.
2022) ............................................................................................................................................. 1

*Pace v. Quintanilla*, 308 F.R.D. 644 (C.D. Cal. 2015)................................................................. 20

*Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) ........................................................................... 17

*Simon and Simon PC v. Align*, 2023 WL 8261297 (N.D. Cal. Nov. 29, 2023)........................... 15

*Young v. ByteDance, Inc.,* Case No. 22-cv-01883-VC, 2023 WL 348215 (N.D. Cal. May 15,
2023) ...................................................................................................................................... 2, 16

*Zepeda Rivas v. Jennings,* 445 F. Supp.3d 36 (N.D. Cal. 2020). ................................................ 19

**Rules**

Fed. R. Civ. P. 23(a)(1).......................................................................................................... 17-20

Fed. R. Civ. P. 23(a)(2).......................................................................................................... 17-20

Fed. R. Civ. P. 23(a)(4) .......................................................................................................... 20

Fed. R. Civ. P. 23(b)(2) .......................................................................................................... 18

Fed. R. Civ. P. 23(b)(2) .......................................................................................................... 20

## I.    INTRODUCTION

Plaintiff Reece Young respectfully submits this motion for class certification. The motion presents two questions on which the case turns and which are common to the proposed class: (1) do Defendants retain control of the work of the proposed class members, and (2) were Defendants negligent in the exercise of that control.

As set forth below, and under the standards applicable to Rule 23 motions, these questions are "'capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011) ("*Dukes*")).

Plaintiff can show by a preponderance of the evidence that the requirements of Rule 23 are satisfied. The proposed class is comprised of at least 12,000 people, and is thus sufficiently numerous. The class members are bound together by common questions of fact and law. The Plaintiff is a proper class representative as his claims are typical of the absent class members, and he and proposed class counsel will adequately represent the class. The Defendants have acted and refused to act on grounds that are generally applicable to the class as a whole by creating and maintaining conditions that put the entire class at risk of developing PTSD and other disorders and failing to take appropriate steps to protect against and mitigate that risk and to provide remedies for those who have developed disorders as a result of their work for TikTok. One injunction will provide class-wide relief. Certification of a class of content moderators who performed work for TikTok through vendors is appropriate.

## II.    STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiff has satisfied his burden to show that a class can be certified under Rule 23 given the common questions which predominate and the common way in which Defendants have acted and failed to act in relation to the proposed class.

## III.    BACKGROUND AND PROCEDURAL HISTORY

### a.  Plaintiff's Claims

Plaintiff asserts class claims under California law on behalf of content moderators for negligent exercise of retained control against Bytedance, Inc. and TikTok, Inc., California corporations which operate TikTok. In denying Defendants' Motion to Dismiss the Second Amended Complaint, the Court ruled that California law applies to Plaintiff's claims. *Young v. ByteDance, Inc.,* Case No. 22-cv-01883-VC, 2023 WL 348215, * 2 (N.D. Cal. May 15, 2023).

### b.  Experiences of Content Moderators

Reece Young worked for Atrium. Declaration of Reece Young ("Young Decl."), ¶ 2. He had roles including R1 review and QA. In these roles he was repeatedly exposed to harmful explicit graphic content. The content was delivered through TikTok's training software and was shown to new moderators, who underwent a two to three week training period before they began doing actual content moderation work. Young Decl., ¶ 3. Young does not recall Atrium making counselors available to people doing content review for TikTok. The only wellness benefit he recalls was an app. Young Decl., ¶ 4.  The harmful content he saw repeatedly included the beheading of a woman. Young Decl., ¶ 5. Young did not receive any warning that he would be exposed to content like this at Atrium. Young Decl., ¶6. He used the TCS system to do content review work for TikTok, as did all other content moderators and QAs that worked for Atrium. TikTok used the TCS system to track Mr. Young whenever he was not active on TCS, and there would be negative ramifications for him as a result. Young Decl., ¶ 7.

Ashley Velez worked for Telus. She was interviewed for the job by a recruiter. She received three weeks of training (her class did not pass the first time) on TikTok's Juren system. Williams Decl., Exh. 10 (Deposition of Ashley Velez (hereinafter ("Velez")) at 38.  Ms. Velez

worked from home, Williams Decl., Exh. 10 Velez at 16-17, with a laptop and TCS to do content moderation for TikTok. Id at 38. She was told, falsely, that the worst things she would see would be during training. Williams Decl., Exh. 10 Velez at 56. Ms. Velez saw disturbing content often, and often saw the same disturbing content many times. This included the brutal beating of a child that was the same age as her own child. Williams Decl., Exh. 10 Velez at 95-96. She was aware that other moderators were complaining about "too much gore, too much violence, too much CSAM material." Williams Decl., Exh. 10 Velez at 108. Ms. Velez was told that TikTok set performance measures, and Telus made sure she adhered. Williams Decl., Exh. 10 Velez at 43. TikTok audited work her work. Williams Decl., Exh. 10 Velez at 43, 102. Ms. Velez received emails directly from Bytedance. Williams Decl., Exh. 10 Velez at 45. She often asked to switch queues because she was seeing too much bad content. Williams Decl., Exh. 10 Velez at 58. Sometimes Telus complied, sometimes it did not. Telus actively discouraged content moderators from describing what the work was like to prospective content moderators. Williams Decl., Exh. 10 Velez at 61. The TCS software often did not work well. Williams Decl., Exh. 10 at 79; 83; 108 ("there was bad stuff in the mild queue, and there was mild stuff in the bad queue. She was not able to grayscale, and could not do job with audio muted). Williams Decl., Exh. 10 Velez at 80.

Jazmyn Blake worked for TPUSA in El Paso, Texas doing content moderation work for TikTok in 2020 to 2023. Declaration of Jazmyn Blake, ¶ 2 ("Blake Decl."). She held roles at TPUSA including Quality Assurance (QA) and Team Trainer. In these roles she repeatedly was exposed to harmful explicit graphic content. This content was delivered through TikTok's training software and was shown to new moderators, who underwent a two to three week training period before they began doing actual content moderation work. These employees did not receive any wellness benefits or wellness breaks before they finished training, and did not receive follow up concerning their mental wellbeing. They were expected to raise mental health issues on their own but were uncomfortable doing so. In addition, QAs and Team Trainers did not receive any wellness benefits relating to their exposure to harmful content. Blake Decl., ¶ 3. To the extent that TPUSA had "counselors" working

with content moderators while she was there, the counselors were not experts in trauma related issues, were believed by staff to be sharing concerns which were raised with them to management, and were known to be dating content moderators. Management, in turn, looked negatively on the use of counselors' services.  All of these things discouraged content moderators from using their services. Blake Decl., ¶ 4. Ms. Blake and the trainees she worked with repeatedly saw harmful content including child pornography which included unblurred faces and unblurred genitals. Ms. Blake saw this content repeatedly, and she and the trainees also repeatedly saw gory video including a woman having her head cutoff. Blake Decl., ¶ 5. Neither Ms. Blake nor the trainees received any warning that they would be exposed to content like that described above while working at TPUSA El Paso. Blake Decl., ¶ 6. Ms. Blake used the TCS system to do content review work for TikTok, as did all other content moderators, QAs and Team Trainers that worked at TPUSA El Paso. TikTok used the TCS system to track content moderators whenever they were not active on the TCS, and there would be negative ramifications for them as a result. TikTok directly communicated with Ms. Blake through the LARK system, pressuring her and others to train workers more quickly and make people work harder. This added to the pressure of the job. Blake Decl., ¶ 7.

When recruited for the job, she was told it was going to be fun, "just like watching videos on your phone." Williams Decl., Exh. 11 (Deposition of Jazmyn Blake (hereinafter "Blake")) at 26; 28 The interview process had nothing to do with resiliency or content moderation and was "pretty irrelevant to the job position." Williams Decl., Exh. 11 Blake at 35. She had three weeks of training on TikTok's Juren system. Williams Decl., Exh. 11 Blake at 45. During training she specifically asked about harmful content, and was told "it wouldn't be that much", something like "once a month." The only description of the content was "shocking." Williams Decl., Exh. 11 Blake at 46. Trainers downplayed it, said it "was very light, . . . [y]ou might see it, you might not, just depending." Ms. Blake was then shocked when she saw gore, violence, CSAM (child sexual abuse material) and animal abuse. Williams Decl., Exh. 11 Blake at 49; 79. She saw these things during training, Williams Decl., Exh. 11 Blake at 80, 99; and afterwards *Id.* at 82. The training material was prepared by TikTok. Blake at 80-81; 102. In some work queues she saw disturbing content roughly every two

weeks, and in other queues it was even more frequent. Williams Decl., Exh. 11 Blake at 82-83. Ms. Blake struggled to give more examples at her deposition because of the emotional reaction she had while recalling these things and testifying. Williams Decl,. Exh. 11 Blake at 49. She did not have access to tools in TCS to ameliorate these harms. Williams Decl., Exh. 11 Blake at 82-83. She was given assignments and performance targets directly from TikTok. Williams Decl., Exh. 11 Blake at 56-59; 71. She was provided with direct feedback about her work performance from TikTok. Williams Decl., Exh. 11 Blake at 69-70. She used counseling once when she had a particularly hard time with gory content, but the counselor offered nothing more than breathing and going for a walk. Williams Decl., Exh. 11 Blake at 91-92. In her experience, trainees were expected to raise mental health issues on their own, but were uncomfortable doing so because of the pressure being put on them. Williams Decl., Exh. 11 Blake at 112.

Tomy Monzon worked for VACO San Francisco LLC doing content moderation work for TikTok. Declaration of Tomy Monzon ("Monzon Decl.") ¶ 2. He worked from home. *Id.* While working for Vaco, he repeatedly was exposed to harmful explicit graphic content delivered to him through TikTok's training software, and shown to new moderators. Monzon Decl., ¶ 3. Mr. Monzon received minimal wellness benefits and care from VACO. Monzon Decl., ¶ 4. He did not receive any warning about the type of content he would be shown while at VACO. Monzon Decl., ¶ 5. He used the TCS system to do content review work for TikTok, as did all other content moderators that worked for VACO. TikTok used the TCS system to track Mr. Monzon when he was not active on TCS, and there would be ramifications as a result. Monzon Decl., ¶ 6.

   **c.  Defendants' Business Model**



NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION



access to the materials that the content moderators review, which are sent directly from Defendants to the content moderators.

### d. Defendants Exercise Significant Control Over the Proposed Class Members

As set forth above, all content moderators used TCS to do their work. Williams Decl, Exh. 17, Crosby at 141. TikTok owns and controls TCS and uses it to send work to content moderators. The vendors have no access to TCS. One of Defendants' witnesses described TCS as follows:

> "TCS is a view system that allows content moderators to be able to enter a queue or a workflow and moderate content. It works similar to a ticketing system. So once one piece of content has been moderated, the next piece to be reviewed will be generated into the queue."

Williams Decl, Exh. 13, Logsdon at 105.

Content is received from TikTok. The pace of work was controlled by TikTok. The training was provided by TikTok and used TikTok materials. Defendants used scorecards and TCS to monitor and track the work done by content moderators. Williams Decl., Exh. 13, Logsdon at 171-173. Demand forecasts for US content moderators come from Kuala Lumpur. Williams Decl, Exh. 17, Crosby at 44. Neither Defendant is in Kuala Lumpur.

TikTok employees scored content moderators, both those that worked for Atrium and those that worked for other vendors. Williams Decl,. Exh. 13, Logsdon at 46:13-22. The scorecards were then given to the vendor – whether Atrium or another – to communicate the results and enforce deficiencies. Williams Decl., Exh. 13, Logsdon at 47-49. Content moderators hired through Atrium did R1 review and R2 review. Williams Decl., Exh. 13, Logsdon at 62. Content moderators for Intellipro did the same thing. Williams Decl., Exh. 13, Logsdon at 63. Content moderators at Atrium use Lark. Williams Decl., Exh. 13, Logsdon at 80. Contracts with Atrium, and Intellipro did not provide any steps for them to take to protect the well-being of content moderators.  Williams Decl., Exh. 13, Logsdon at 102.



**e.   Defendants' Knowledge of Risks**





Hebel at 60-61. The present statements of work with vendors do not include the things that are in the Well-being Program Requirements. Williams Decl., Exh. 15 Castaldo at 92-93; 97.

Before she became employed by Defendants, Steiger co-authored an article which stated "Repeated, prolonged exposure to specific content, coupled with limited workplace support, can significantly impair the psychological well-being of human moderators.". Williams Decl., Exh. 11 Steiger 1 at 215; Exh. 25. This statement is consistent with current understandings of this job and its effects. See Expert Reports and Declarations of Sonya Norman, Ph.D. and Patricia Watson, Ph.D., submitted herewith on behalf of Plaintiff and the proposed class. Steiger has now, while employed by Defendants, disavowed this statement but is unable to provide any support for her position. Williams Decl., Exh. 11 Steiger 1 at 215 – 224. Steiger has written that "when left unattended, repeated or overexposure to graphic and disturbing content increases psychological and emotional distress." Williams Decl., Exh. 12 Steiger 1 at 277. Steiger now says that she takes no position as to whether this statement is correct. Williams Decl., Exh. 11 Steiger 1 at 278. Steiger admits that some content moderators can suffer adverse mental health effects. Williams Decl., Exh. 11 Steiger 1 at 242.

Steiger admits that vendors must have available trauma informed professionals. Williams Decl., Exh. 11 Steiger 1 at 256-257. TikTok only has grayscaling, audio muting and blurring. Williams Decl.., Exh. 11 Steiger at 257-258. TikTok does not require its vendors to permit content moderators to opt out from seeing any potentially harmful conduct if they are having an episode or experience because of the work they are doing. Williams Decl., Exh. 11, Steiger 1 at 259. Defendants have not established any hiring guidance that its vendors should follow. Williams Decl., Exh. 11 Steiger at 264. Defendants do not require their vendors to have helplines available for content moderators to call. Williams Decl., Exh. 11 Steiger at 267.

Steiger admits that at a minimum, content moderators need "at least general counseling available, so one-to-one sessions with a trained professional, meaning a licensed professional who is credentialed, group therapy available to these individuals if they so choose. Among' other things that TikTok has failed to complete are its wellness standard operating procedures,

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

**f.  Defendants Have Been Negligent in Exercising Their Retained Control**

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

**g.  Plaintiff's Expert Opinions Support Certification**

Plaintiff believes that the requirements of class certification are met solely through the non-expert evidence that has been submitted. In addition to that evidence, Plaintiff also submits and relies upon the Declaration and Expert Report of Patricia Watson, Ph.D. and the Expert Report and Declaration of Sonya Norman, Ph.D.

Dr. Patricia Watson is a clinical psychologist working at the VA National Center for PTSD. Prior to joining the National Center for PTSD in 1998, Dr. Watson was an active-duty Navy psychologist for eight years. She is a Co-author of NCPTSD's Psychological Fist Aid Field Guide and Skills for Psychological Recovery (SPR) Manual, designed to intervene in the immediate and intermediate phases after disasters and terrorism. She is also co-author of the

Combat Operational Stress First Aid peer support intervention, and Stress First Aid for Firefighters and Emergency Services Personnel, a self-care and coworker support model for high stress jobs, versions of which have been adapted for law enforcement processionals, forest firefighters, heatlhcare workers, pretrial and probation officers and rail workers. She has co-edited three books on disaster behavioral health interventions, as well as numerous articles, guidance documents, courses and chapters on disaster mental health. Dr. Watson has specialized in combat and operational stress, early intervention, and resilence. Dr. Watson's education includes a doctoral degree in clinical psychology from Catholic University, and a postgraduate fellowship in pediatric psychology at Harvard Medical School. Watson Decl, ¶ 1.

Dr. Watson opines, inter alia, that "occupations that expose workers to traumatic experiences put those workers at risk of developing mental health problems. Organizational factors that put people at higher risk for negative stress reactions such as PTSD include lack of or little preparation and training, less organizational satisfaction, poor support from leadership, high workload, poor teamwork and lack of feeling supported or validtated by colleagues. Psychological burdens increase with the degree of intensity of the contents as well as the frequency of contact with the material." Watson Decl., ¶ 2. She identifies various means which can be used to mitigate and ameliorate the harm caused by doing this work, including references to work she did in implementing changes at both Facebook and YouTube. Watson Decl., ¶¶ 3-8.

Dr. Sonya Norman is a clinical psychologist and researcher in the treatment of posttraumatic stress disorder (PTSD) and addictions and in the implementation of evidence-based treatments for PTSD. She currently serves as the Director of the PTSD Consultation Program at the VA National Center for PTSD, and as a Professor of Psychiatry at the University of California San Diego School of Medicine. She previously served as Director of the San Diego VA's PTSD treatment program and as a member of the VA/DoD PTSD Clinical Practice Guideline Work Group.  She has conducted extensive research into the treatment of PTSD and other trauma-related disorders. She has authored over 220 publications related to PTSD, addiction, and other disorders related to traumatic experiences including extensive research into

the effectiveness of prolonged exposure therapy.  Dr. Norman has served as the principal

investigator on research grants relating to PTSD that has received over $30 million in funding

and as a primary investigator, mentor, consultant or co-investigator on numerous other PTSD-

related research projects. Dr. Norman is a graduate of Vassar college and received a Ph.D. in

Counseling Psychology from Stanford University. Norman Decl., ¶ 1.

Dr. Norman has the opinion, *inter alia*, that "[t]rauma exposure like that suffered by

content moderators can cause PTSD. Indeed, the current edition of the Diagnostic and Statistical

Manual of Mental Disorders (DSM-T5) states that PTSD can be caused by "[e]xposure to actual

or threatened death, serious injury, or sexual violence [by] experiencing repeated or extreme

exposure to aversive details of the traumatic event(s). . . ." Am. Psychiatric Ass'n, *Diagnostic

and Statistical Manual of Mental Disorders* 271 (5th ed. 2013) (emphasis added).  The DSM-5

expressly states that work-related exposure through electronic media, such as the exposure

experienced daily by TikTok content moderators, can lead to PTSD. *Id."* Normal Decl., ¶ 5; ¶ 10

("[e]xtended viewing of disturbing materials like those seen by the proposed class members can

lead to the development of posttraumatic stress disorder (PTSD) and other trauma-related

disorders".) The consequences of Trauma Exposure can be debilitating and cause many

disorders. Normal Decl., ¶¶ 6-7.

Dr. Norman worked with Facebook and YouTube to develop policies and practices that

were intended to mitigate and ameliorate the harm caused to content moderators, and those

policies and practices were implemented as part of fully-approved class action settlements.

Norman Decl., 8-9. Dr. Norman worked with Dr. Watson and supports approaches that could be

taken

## IV.    LEGAL STANDARD

Before a class may be certified, the district court must conduct a

"rigorous analysis" to determine if the prerequisites of FRCP 23 have

been satisfied. *Olean* [31 F.4th at 664] (en banc). The plaintiffs must

"actually *prove*—not simply plead" *Halliburton Co. v. Erica P. John*

*Fund, Inc.,* 573 U.S. 258, 275 (2014). The plaintiffs bear the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence. *Olean*, 31 F.4th at 665.

*Lytle v. Nutramax Laboratories, Inc.,* Case No. 22-55744, ___ F.4th ___, 2024 WL 3915361 (9th Cir. Aug. 23, 2024).

At the class certification stage, the district court "must make a rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the class-wide evidence to prove the common question in one stroke." *Olean*, 31 F.4th at 666 (9th Cir. 2022) (quotations and brackets omitted) That inquiry is "limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 667 (emphasis in original). A "district court cannot decline certification merely because it considers plaintiff' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id.*

*Simon and Simon PC v. Align*, Case No. 20-cv-03754-VC, 2023 WL 8261297, * 3 (N.D. Cal. Nov. 29, 2023)

Plaintiff bears the burden of demonstrating by a preponderance of the evidence that the requirements of Rule 23 are met. *See Dukes*, 564 U.S. 338, 350-351; *Olean,* 31 F.4th at 665. The Court must also be satisfied that the party seeking certification has met the requirements of one of the three subsections of Rule 23(b). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Under Rule 23(b)(2), that means 23(b)(2) that the Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class". *Huebner v. Radaris, LLC,* Case No. 14-cv-04735-VC, 2016 WL 8114189, * 1 (N.D. Cal. April 12, 2016). Under Rule 23(b)(3), that means that class questions predominate over individual

questions, and that class treatment is superior to other forms of adjudication. *Corvello v. Wells Fargo*, Case No. 10-cv-05072-VC, 2016 WL 3995909, * 4 (N.D. Cal. January 29, 2016).

## V.    LEGAL ARGUMENT

### a.    The Requirements for a Class Under Rule 23(a) are Satisfied

#### i.    The Proposed Class Meets the Numerosity Requirement

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Defendants estimate the proposed class at over 12,000. Williams Decl., Exh. 22. Plaintiff believes that the class is at least 15,000.  Williams Decl., ¶ 38.

#### ii.    The Proposed Class Meets the Commonality Requirement

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality can be satisfied by a single common issue. *Abdullay v. U.S. Sec. Assocs., Inc.,* 731 F.3d 952, 957 (9th Cir. 2013).  When a plaintiff seeks injunctive relief, commonality is present when the action challenges a "system-wide practice or policy that affects all of the putative class members." *Unknown Parties v. Johnson,* 163 F.Supp.630, 635 (D. Ariz. 2016).

This Court has already ruled that California law applies to the claims asserted by Plaintiff. *Young v. ByteDance, Inc.,* Case No. 22-cv-01883-VC, 2023 WL 348215, * 2 (N.D. Cal. May 15, 2023). There is no reason to disturb that ruling, as Defendants are California corporations based in California, including in this Judicial District. To the extent that Defendants argue that other states law applies, they have shown no basis to disturb the Court's prior ruling. In any event, those states where most class members reside recognize the same claim that California law applies under circumstances like these. *Calvasina v. Walmart Real Estate Business Trust*, 906 F. Supp.2d 625, 629 (W.D. Tex. 2012) (Texas recognizes cause of action for negligent exercise of retained control); *Gates v. Pickett & Nelson Const. Co.,* 432 P.2d 780, 786 (Idaho 1967) (Idaho recognizes a cause of action for negligent exercise of retained control). The elements to prove these claims do not differ among the states, as they all derive from Restatements.

The common questions here are plain: do Defendants owe a duty of care to the proposed class because they retain significant, if not exclusive, control of all material aspects of the work being done, and if yes have Defendants breached that duty. These questions override any individualized questions, apply to all or nearly all class members, and support certification. Defendants have failed to point to any individualized issues which would defeat commonality.

Defendants have argued that various arbitration agreements and class action waivers. Defendants are mistaken. First, as to vendors Atrium and TPUSA, there are no arbitration agreements or class action waivers. By Defendants' calculation, 3,928 potential class members worked for Atrium and TPUSA. Williams Decl., Exh. 23. As to vendor VACO San Francisco LLC, the agreement at issue (1) does not apply to all disputes, but rather to inventions, and (2) is permissive – i.e., it gives the employee the choice of seeking arbitration or filing an action in Court. As a result, this agreement does not bar claims in this Court given that they are expressly permitted. Williams Decl., Exh. 9. By Defendants' estimate, 398 potential class members worked for VACO San Francisco LLC, bringing the number of potential class members not subject to this argument to 4,326. Williams Decl., Exh. 23.

### iii.  The Proposed Class Representative Meets the Typicality Requirement

Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." "The test of typicality is 'whether other members [of the class] have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff[], and whether other class members have been injured by the same course of conduct. *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

Plaintiff Reece Young presents claims which are typical of the Class. While he worked for Atrium, his experience is in all respects identical to the experiences of other content moderators who worked for other entities. The experiences of Ms. Velez, Ms. Blake, and Mr. Monzon described above are substantially similar to those of Mr. Young. The evidence about

how this work is done supports the fact that there are no meaningful differences between Mr. Young's experience and that of other proposed class members. Defendants have never brought forth evidence to substantiate the claim that there is any meaningful difference between the work done by Mr. Young at Atrium and the work that any other potential class member did reviewing content for TikTok.

>    iv.    **Plaintiff has, and will, Fairly and Adequately Protect the Interests of the Class**

Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the class. Plaintiff Reece Young has been a model class representative in this case. He sought counsel after reading about the *Frazier* case. He reviewed the qualifications of counsel and decided to go forward as a class representative because the case and the cause are important to him. He has had to open up his personal mental health history as a result of discovery rulings in this case, and has had to suffer through an intrusive deposition concerning matters that are not relevant to any issue in dispute. He is acting as a class representative because he believes that he and other content moderators were harmed by Defendants, and that Defendants could take steps to remedy these harms.

Proposed Class Counsel was co-lead counsel for the Settlement Classes in *Scola v. Facebook,* San Mateo County Superior Court case no. 18cv05135 and *Doe v. YouTube, Inc.,* Northern District of California case no. 4:20-cv-07493-YGR. Those cases involved complex issues and well-heeled adversaries represented by sophisticated counsel (including, in the *Doe* caes, former counsel for Defendants in this case). Both of those cases resolved favorably to the classes. *Scola* resulted in a fully-approved $52 million cash settlement and changes in workplace procedures for Facebook and its vendors. *Doe* settled on similar terms on a *per capita* basis. Counsel has litigated class actions, and certified classes, in federal district courts around the country. Counsel for plaintiff has dedicated significant time and resources to this case on behalf of the proposed class.

### b.  Certification is Appropriate Under 23(b)(2)

Rule 23(b)(2) permits certification when the party opposing the class has acted or refused to act on grounds that apply generally to the class, sot aht final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. The evidence cited above supports the conclusion that certification under Rule 23(b)(2) is appropriate. For all content moderators who are members of the proposed class, their circumstances and relationship to Defendants are identical. Defendants dictate every manner of the work, know that the work is harmful, yet fail to require any safeguards, protections or suitable warnings for the class members, Defendants could do the right thing – their peers Facebook and YouTube have both implemented changes that Defendants have not implanted. Defendants even came close when they included a Well-Being Program as part of contracts with vendors, but then they chose not to enforce those programs. The time has come for them to do so, and an order certifying a class under Rule 23(b)(2) would permit a trial by which proper procedures, safeguards and tools could be implemented to help all class members. *See Zepeda Rivas v. Jennings,* 445 F. Supp.3d 36 (N.D. Cal. 2020).

The first person to challenge the practices at issue here was fired within days of filing her complaint. Williams Decl., ¶ 2. Other potential class members are subject to confidentiality clauses that Defendants require their vendors to impose, suppressing the ability or willingness of others to step forward. Williams Decl., ¶¶ 4-11. Further, Defendant has closed at least five of the sites that provided content moderators during the class period. For these reasons, neither standing challenges nor mootness should be seen as a basis to deny class certification.

Plaintiff need not demonstrate a "real or immediate threat that [DEFENDANTS] will again subject him to harm. *B.C. v. Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1264 (9th Cir. 1999). In the *Frazier* case, the Plaintiff ws fired from her job for Telus for filing an action challenging TikTok's business practices. Williams Decl. ¶ 2. Plaintiff Young filed his action as a result of hearing of the *Frazier* action. Over the course of this case, TikTok has shut down at least five of the entities for which proposed class members worked – Atrium, Intellipro, Majorel, Vaco San

Francisco LLC and Webhelp. Defendants can open and close their vendors any time that they wish, making them capable of destroying the ability of any potential class member to ever bring a claim against them. *See also Doe v. Wolf,* 424 F. Supp.3d 1028, 1037 (S.D. Cal. 2020).

### c. Certification is Appropriate Under 23(b)(3)

#### i. Common Questions Predominate

The core factual and legal questions in this case, including whether Defendants retained control over working conditions of the class members and whether Defendants negligently exercised that control are common to the class, and the Plaintiff alleges claims typical of the class. Fed. R. Civ. P. 23(a)(2), (3); *see, e.g.*, *Brown v. China Integrated Energy Inc.*, Case No. CV 11-02559-BRO (PLA), 2015 WL 12720322, at *14 (C.D. Cal. Feb. 17, 2015). Further, Plaintiff has shown that a class action is superior to other methods for adjudicating this controversy. *See* Fed. R. Civ. P. 23(b)(3); *cf. Pace v. Quintanilla*, 308 F.R.D. 644, 649 (C.D. Cal. 2015) (class action is superior when there is a common core of facts).

#### ii. A Class Action is Superior

A class action is superior here for many reasons. First, only a class action involving these Defendants could bring relief to this proposed class. It would be impossible for class members to bring individual actions to effectuate the relief sought here. Indeed, most class members would be utterly unaware that they would be permitted to bring an action against Defendants in any way other than as a class action, as they have no direct relationship with the Defendants and would not be aware that, potentially, they could use arbitration agreements with their employers as a means to pursue claims against Defendant. This is much too granular an aspect of federal civil procedure for potential class members to be aware of. And, even if they did, they would face a corporate behemoth and its extremely competent counsel. The cards would be stacked against the potential class members in any action other than a class action.

### VI.    CONCLUSION

For all of the reasons set forth above, and for such further reasons as may be

presented to the Court, Plaintiff respectfully moves the Court to certify a class of all

people in the United States who performed content moderation work (including

Trainers and QAs) for TikTok between March 24, 2020 and the present and who were

not directly employed by TikTok. Excluded from the proposed class are Defendants,

Defendants' employees, and the Court and its staff.

Dated: September 20, 2024                    Respectfully Submitted:

/s/ *Steven N. Williams*
Steven N. Williams (State Bar No. 175489)
Kai'Ree K. Howard (State Bar No. 351730)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: 415-697-1509
Fax : 415-230-5310
Email: swilliams@stevenwilliamslaw.com
Email: khoward@stevenwilliamslaw.com

*Attorneys for Plaintiff and the Proposed
Class*