GIBSON, DUNN & CRUTCHER LLP
JESSE A. CRIPPS, SBN 222285
    JCripps@gibsondunn.com
LAUREN M. BLAS, SBN 296823
    LBlas@gibsondunn.com
LEONORA COHEN, SBN 319463
    LCohen@gibsondunn.com
VIOLA H. LI, SBN 327783
    VHLi@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071
Telephone:    213.229.7000
Facsimile:    213.229.7520

*Attorneys for ByteDance Inc. and TikTok Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REECE YOUNG, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>  vs.<br><br>BYTEDANCE INC. and TIKTOK INC.,<br><br>       Defendants. | CASE NO. 3:22-cv-01883-VC<br><br>**DEFENDANTS TIKTOK INC. AND BYTEDANCE INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Judge:  Hon. Vince Chhabria<br>Date:    December 19, 2024<br>Time:   10:00 a.m.<br>Room:  Courtroom 5, 17th Floor |

*PUBLIC*
*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

# TABLE OF CONTENTS

Page(s)

I.      INTRODUCTION ....................................................................................................1

II.      RELEVANT FACTUAL BACKGROUND...............................................................2

     A.      TikTok's business relationship with content moderation vendors ...............2

     B.      Variation in content moderators' experiences ...............................................5

III.      PROCEDURAL HISTORY......................................................................................6

IV.      STATEMENT OF ISSUE TO BE DECIDED UNDER RULE 7-4(A)(3)...............7

V.      ARGUMENT ...........................................................................................................7

     A.      Young's claim can't proceed on a classwide basis........................................7

         1.      Every element of Young's negligence claim will require resolving highly individualized issues. ..........................................................7

         2.      The injunction Young seeks underscores why certification is inappropriate. ................................................................................17

         3.      Choice of law issues involving 24 states also preclude certification...............20

     B.      Young is an atypical and inadequate class representative. ..........................23

VI.      CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ................................................................................................................. 7

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................................... 22, 24

*Anti Police-Terror Project v. City of Oakland*,
  2021 WL 4846958 (N.D. Cal. Oct. 18, 2021) ................................................................... 11

*Az. All. for Retired Americans v. Mayes*,
  — F.4th —, 2024 WL 4246721 (9th Cir. Sept. 20, 2024) ................................................. 15

*B.C. v. Plumas Unified Sch. Dist.*,
  192 F.3d 1260 (9th Cir. 1999) ..................................................................................... 18, 19

*Baldonado v. El Paso Nat. Gas Co.*,
  143 N.M. 297 (N.M. Ct. App. 2006) .................................................................................. 22

*Barraza v. C. R. Bard Inc.*,
  322 F.R.D. 369 (D. Ariz. 2017) .......................................................................................... 15

*Bayer v. Neiman Marcus Group, Inc.*,
  861 F.3d 853 (9th Cir. 2017) ....................................................................................... 18, 19

*Bellman v. S.F. High Sch. Dist.*,
  11 Cal. 2d 576 (1938) ................................................................................................... 11, 15

*In re Capacitors Antitrust Litig.*,
  154 F. Supp. 3d 918 (N.D. Cal. 2015) .............................................................................. 15

*Casias v. Distrib. Mgmt. Corp., Inc.*,
  2014 WL 12710236 (D.N.M. Mar. 31, 2014) ...................................................................... 9

*Chavez v. Blue Sky Natural Beverage Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010) ....................................................................................... 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................................ 20

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .......................................................................................................... 8, 17

*Davidson v. Apple, Inc.*,
  2018 WL 2325426 (N.D. Cal. May 8, 2018) ...................................................................... 18

*Dent v. NFL*,
  2021 WL 3885954 (N.D. Cal. Aug. 31, 2021), *aff'd*, 2023 WL 2983580 (9th Cir. Apr.
  18, 2023) ............................................................................................................................. 22

*Doe v. Wolf*,
    424 F. Supp. 3d 1028 (S.D. Cal 2020)................................................................................19

*Donaldson v. Microsoft Corp.*,
    205 F.R.D. 558 (W.D. Wash. 2001).................................................................................24

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .................................................................................18, 19, 24

*In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*,
    273 F.R.D. 499 (N.D. Ind. 2010)......................................................................................9

*In re Flash Memory Antitrust Litig.*,
    2010 WL 2332081 (N.D. Cal June 9, 2010).....................................................................17

*Gardner v. Health Net, Inc.*,
    2010 WL 11579028 (C.D. Cal. Sept. 13, 2010) ...............................................................25

*D.C. ex rel. Garter v. Cnty. of San Diego*,
    783 F. App'x 766 (9th Cir. 2019)......................................................................................17

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982)..........................................................................................................24

*Guillory v. Am. Tobacco Co.*,
    2001 WL 290603 (N.D. Ill. Mar. 20, 2001)......................................................................16

*Guzman v. Bridgepoint Educ., Inc.*,
    305 F.R.D. 594 (S.D. Cal. 2015) ........................................................................................6

*Harry v. Ring the Alarm, LLC*,
    34 Cal. App. 5th 749 (2019).............................................................................................22

*Hightower v. JPMorgan Chase Bank, N.A.*,
    2012 WL 12878311 (C.D. Cal. Sept. 12, 2012) ...............................................................19

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) ..........................................................................................18

*Houghtailing v. Crown Equip. Corp.*,
    2015 WL 1090386 (N.D. Cal. Mar. 12, 2015)..................................................................11

*Howard v. Hain Celestial Group, Inc.*,
    2024 WL 718180 (N.D. Cal. Feb. 22, 2024).....................................................................19

*Howe v. Diversified Builders, Inc.*,
    262 Cal. App. 2d 741 (Cal. Ct. App. 1968)......................................................................23

*Hunters Cap., LLC v. City of Seattle*,
    2022 WL 1449387 (W.D. Wash. May 9, 2022).................................................................11

*Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*,
    313 U.S. 487 (1941)..........................................................................................................21

*Knight v. Jewett,*
   3 Cal. 4th 296 (2006) ........................................................................................................15

*Lewallen v. Medtronic USA, Inc.,*
   2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) ...............................................................15, 23

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..........................................................................................................11

*Maketa v. Target Corp.,*
   2024 WL 4311702 (N.D. Cal. Sept. 26, 2024) ................................................................25

*McDonald v. Shell Oil Co.,*
   44 Cal. 2d 785 (1955) ........................................................................................................8

*Nelson v. F. Hoffmann-La Roche, Inc.,*
   642 F. Supp. 3d 1115 (N.D. Cal. 2022) ............................................................................23

*O'Connor v. Boeing N. Am., Inc.,*
   180 F.R.D. 359 (C.D. Cal. 1997) ......................................................................................20

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   31 F.4th 651 (9th Cir. 2022) .............................................................................................15

*Phan v. Sargento Foods, Inc.,*
   2021 WL 2224260 (N.D. Cal. June 2, 2021) ...................................................................25

*Pilgrim v. Universal Health Card, LLC,*
   660 F.3d 943 (6th Cir. 2011) ...........................................................................................20

*Poe v. Nw. Mut. Life Ins. Co.,* 2
   2023 WL 5251875 (C.D. Cal. Aug. 14, 2023)..................................................................25

*Potter v. Firestone Tire & Rubber Co.,*
   6 Cal. 4th 965 (1993) ........................................................................................................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
   725 F.3d 244 (D.C. Cir. 2013) .........................................................................................17

*Rollins v. Dignity Health,*
   336 F.R.D. 456 (N.D. Cal. 2020) .....................................................................................25

*Sandoval v. Qualcomm Inc.,*
   12 Cal. 5th 256 (2021) ..................................................................................................8, 22

*Schlesinger v. Reservists Comm. to Stop the War,*
   418 U.S. 208 (1974)...........................................................................................................20

*Simon v. Eastern Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976).............................................................................................................18

*Smilow v. Sw. Bell Mobile Sys.,*
   323 F.3d 32 (1st Cir. 2003)...............................................................................................17

*Sultanis v. Champion Petfoods USA Inc.*,
 2021 WL 3373934 (N.D. Cal. Aug. 3, 2021) ...............................................................25

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021).......................................................................................................12

*Veintimilla v. Dobyanski*,
 975 P.2d 1122 (Colo. Ct. App. 1997) ...........................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) ................................................................................. 8, 18, 20, 22

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
 571 F.3d 953 (9th Cir. 2009) ..........................................................................................9

*White v. Symetra Assigned Benefits Serv. Co.*,
 104 F.4th 1182 (9th Cir. 2024) ...............................................................................20, 22

*Wright v. TEGNA Inc.*,
 — P.3d —, 2024 WL 2967049 (Colo. Ct. App. June 13, 2024)....................................21

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
 259 F.3d 1101 (9th Cir. 2001) .........................................................................................6

*Zinser v. Accufix Rsch. Inst., Inc.*,
 253 F.3d 1180 (9th Cir. 2001) .............................................................15, 20, 21, 22, 23

**Rules**

Fed. R. Civ. P. 23 ..............................................................................................................23

## I.    INTRODUCTION

Plaintiff Reece Young, a one-time moderator who worked for one of TikTok's eight content-moderation vendors in 2021, seeks to represent a group of over 12,000 content moderators currently and formerly employed by those vendors across at least 24 different states over a four-year period.  He claims there were no "meaningful differences" in their experiences and that moderating content *per se* puts moderators "at risk" of developing a mental illness no matter who they are, what they saw, where they saw it, or what they did in response to it.  That's all very well for a complaint, but a motion for class certification demands evidence, not just allegations.  And the evidence here confirms that these "who," "what," and "where" questions, far from being peripheral, are at the very center of what must be decided in this case and turn on highly personal, subjective, and individualized issues.  Whether TikTok owed a duty to the employees of a third-party vendor requires a showing of its right to control, exercise of that control, and affirmative contribution to an employee's injuries.  Those issues alone require a deep dive into the nature of TikTok's contractual relationships with each of its eight vendors over time and the extent of its influence over working conditions at those vendors.  Whether TikTok then breached any duty to a moderator would require yet another layer of inquiries, including into the conditions under which each moderator was trained and the way they did their content moderation work.

Nor would the Court's analysis end there.  Even if duty and breach were established, the Court would still need to examine the extent to which a moderator was harmed—or is "reasonably certain" to suffer future harm—as a result of their moderation work.  That inquiry, in particular, opens up a Pandora's box of questions, insofar as anyone's risk or "reasonable certainty" of suffering psychological injury depends on a wide array of individualized and personal factors, including the nature of the content reviewed; the degree and frequency of exposure to it; the moderator's psychological predispositions, background, and experience; and any wellbeing benefits or technical "tooling" offered and used.  Even if a moderator could establish they are "reasonably certain" to suffer future harm, tracing that risk to their moderation work—amid the passage of time and tangle of life experiences and stressors—would prove even more difficult.  *These* are the kinds of questions that matter at this stage, but they are the very opposite of common questions apt to generate common answers.  And, critically, Young does not have standing to

litigate any of these questions or seek forward-looking changes to how TikTok works with its vendors, as he is a former moderator, with no plans to moderate in the future, who admits he hasn't suffered any injury, and has been doing well since quitting content moderation almost two years ago.

Young seems to think his request for "[o]ne injunction" obviates the need to deal with these issues. Mot. at 1. But there can be no classwide remedy (and certainly no *monetary* remedy) without a wrong that can be proven on a classwide basis. Young offers no way to manageably try the core elements of his negligence claim with classwide proof. Further, he glosses over defenses and state-law variation that independently preclude certification. For example, a defendant can't be liable for risks a plaintiff knowingly agreed to take on—and here, the vendor-employers advised job applicants of the potential risks of moderation in different ways. TikTok has a due-process right to present this defense as to each class member, but doing so would require individualized evaluations of what moderators were told about their work and when. Moreover, while Young hopes to represent a class of people from 24 states, those states differ with respect to what a plaintiff must prove to recover for retained-control negligence and what a defendant must prove to defend against that claim. Young attempts to minimize the significance of that state-law variation, but the Ninth Circuit has put the onus on plaintiffs to prove that a nationwide class action is appropriate despite variations in state law, and Young hasn't even tried to do so here. Nor has he established that he's an adequate and typical member of the class he proposes. His content moderation experience is dramatically different from most of the moderators in the proposed class; he can't represent moderators outside Tennessee; and he can't represent the thousands of class members subject to arbitration agreements. The Court should deny Young's motion for class certification.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    TikTok's business relationship with content moderation vendors

TikTok is a popular platform that lets users connect and share a wide variety of content. And because TikTok considers its users' safety to be of paramount importance, it invests considerable resources to keep the content on its platform safe. *Id.* Less than 2% violates TikTok's guidelines, which prohibit content that (among other things) spreads misinformation, promotes drug use, contains nudity, or

is extremely violent.  Ex. 16 at ¶ 43[1]; Declaration of Jilda Castaldo ("Castaldo Decl.") ¶ 3.  TikTok's automated technology is the first line of defense against violative content and removes a lot of the most egregious content.  Ex. 13; Declaration of Brittani Logsdon ("Logsdon Decl.") ¶ 9.  The remaining content is reviewed by human content moderators.[2]  Ex. 13.

Moderators review "queues" of content.  Queues are continually populated with content, and the type of content in a queue varies significantly across queues and over time.  Ex. 3 at 117.  Some queues, for example, focus on different kinds of media (e.g., video and audio), while others focus on specific types of content (e.g., potential misinformation).  Ex. 11, No. 2; Ex. 4 at 45, 156–58; Ex. 16 ¶ 44.  ███████

████████████████████████████████████████████████████████

███████████████████████ Ex. 4 at 153, 158.  Moderators may have worked on a variety of queues over time, and ████████████████████████████ Ex. 11, No. 2; Ex. 19; Ex. 20.

TikTok has worked with different vendors that provide content moderation services.  Ex. 11, No. 1.  The vendors fell within one of two business models:  the third-party agency or "TPA" model, and the business process outsourcing or "BPO" model.  *Id.*, No. 2.  The TPAs relevant to this lawsuit are Atrium Staffing LLC and Intellipro Group Inc.  *Id.*  TPAs provide their own employees to TikTok on a temporary basis.  *Id.* ████████████████████████████████████████

████████████████████████████ *Id.*, Nos. 2, 8. ██████████████

████████████████████████████████████████████████████████

█████████████████████████████████ Ex. 3 at 48, 192–93. █████████

████████████████████████████████████████████ *Id.* at 49.  Although the TPA content moderators' work varied by moderator, Ex. 11, No. 2, ████████████████

████████████████████████████████████████████ Ex. 3 at 136, 203.  ████████████████████████████████████████████████

████████████████████████ Ex. 3 at 57, 203−04; Logsdon Decl. ¶ 5.

The relevant BPOs are Alorica Inc., Majorel Holding Nederland B.V., Telus International, TP-

---

[1] Cited exhibits are those attached to the Declaration of Lauren Blas ("Blas Decl.").
[2] Refers to third-party moderators only, as moderators employed by TikTok are not in the putative class.

USA Inc., Vaco San Francisco LLC, and Webhelp America LLC. BPOs operate on a fundamentally different model from TPAs: TikTok generally had no involvement with BPO moderators' day-to-day work. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 11, Nos. 2, 8. ████████

██████████████████████████████████ *Id.*, No. 2. ████████████████

████████████████████████████████████ Ex. 1 at 14.

TikTok provided its vendors with the tools needed to review content on the TikTok platform. Ex. 4 at 54–55. Some moderators used TikTok software called TCS to moderate content, while others used other types of tools with different features, such as Lighthouse, depending on the work they were doing. Ex. 3 at 149–50; Castaldo Decl. ¶¶ 5–6. The features, or "tooling," available varied by software and over time. Castaldo Decl. ¶¶ 5–6. For example, by at least 2021, moderators could speed up content, mute it, zoom in and out, and put it in grayscale using TCS, and by 2022, moderators could also blur content. *Id.* ¶ 5. Moderators also could indicate in TCS whether they were moderating content, training, or taking a meal, rest, or wellness break. *Id.* ████████████████████████████████████████

████████████████████████████████████████████ *Id.*

████████████████████████████████████████████████████████████

████████████████████████████████████ Vendors could decide to provide additional time and, although moderators were encouraged to use their wellness time, it was up to each moderator to do so. Ex. 2 at 51–52; *see, e.g.*, Ex. 3 at 112.

████████████████████████████████████████████████ Ex. 11, No. 13. Many, if not all, BPOs chose to provide additional wellbeing benefits on top of ████████████████████████

██████████████████████████ Ex. 11, No. 13; Ex. 2 at 39, 124, 183; Ex. 14; *see, e.g.*, Dkt. 184-6 at 22. For example, Telus offered group wellness sessions, individual sessions (including on an urgent basis), circulated weekly wellness topics, and hosted wellness engagement activities. Ex. 12. Vaco offered daily meditation sessions, weekly yoga classes, and an Employee Assistance Program with 24/7 access to counseling and professional services. *Id.* And TPUSA offered a variety of wellness events,

ranging from cooking demonstrations to artist group sessions, as well as resiliency training. *Id.* The wellbeing benefits available to TPA moderators also varied depending on the moderator's team lead. Ex. 3 at 85. The different moderation teams had varying wellbeing offerings, such as breathwork sessions, exercise classes, and other group engagement activities. *Id.* at 85–86.

### B.    Variation in content moderators' experiences

Each worker's content moderation experience depends on a number of factors, including their background, role, the content they saw, their mental health and coping strategies, and their use of wellbeing benefits and available "tooling" (e.g., turning content to grayscale). Ex. 15 ¶¶ 5(I), 6–13; Ex. 16. Take Plaintiff Reece Young. He worked for Atrium for about nine months in 2021. Ex. 7 at 19–20, 94–95. He worked from home in Tennessee. *Id.* at 9, 21–23. He started in a specialized content moderation team that used Lighthouse to review content and an Excel spreadsheet to moderate it. Ex. 3 at 62; SAC ¶¶ 23, 45; Logsdon Decl. ¶ 11.



Ex. 7 at 30.

*Id.* at 69−70.

*Id.* at 88−90.

*Id.* at 63−65, 144.

*Id.* at 166, 172.

Former-plaintiff Ashley Velez, by contrast, worked remotely in Nevada for Telus (a BPO) for about six months in 2021. Ex. 6 at 5, 16–17, 28.

*Id.* at 82–85.

*Id.* at 57–58, 80.

*Id.* at 66–67, 76, 93–94.

*Id.* at 113−14.

Jazmyn Blake, whom Young offers as a witness, was employed by TPUSA from 2020 to 2023 and worked as a content moderation trainer, quality assurance analyst, and content moderator.  Ex. 8 at 20–21; Dkt. 185-3 ¶¶ 2–3.



## III.    PROCEDURAL HISTORY

Young and Velez filed this putative class action in March 2022, claiming their content moderation work put them "at increased risk of developing psychological harms due to the repeated traumatic viewing they endure at their job without adequate protection, training, and care."  Dkt. 50 (SAC) ¶ 13.  The Court compelled Velez to arbitration, leaving Young as the only plaintiff.  Dkt. 104.

As discovery came to a close, TikTok moved to deny class certification on the narrow issue that over 65% of the putative class is subject to arbitration agreements with class action waivers like Velez. *See* Dkt. 142.  Although the Court denied that motion, it acknowledged TikTok "make[s] an exceedingly strong argument to exclude from the class anyone who signed an arbitration agreement," directed the parties to address the issue with Young's class certification motion, and invited the parties to incorporate their prior briefs by reference.  Dkt. 168.

Young hasn't excluded those with arbitration agreements and still seeks to certify a class under Rules 23(b)(2) and (b)(3) of "[a]ll people in the United States who performed content moderation work (including Trainers and QAs) for TikTok between March 24, 2020 and the present and who were not directly employed by TikTok," which includes people from at least 24 states.  Not. of Mot. at i–ii; *see* Dkt. 142, Fig. 1 (states).  Excluded from the proposed class are "Defendants, Defendants' employees"

---

[3] The Court should exclude the declaration of a fourth moderator, Tomy Monzon (Dkt. 185-34), under Rule 37(c)(1) because Young failed to disclose him as a potential witness before fact discovery closed on July 29, 2024 (Dkt. 125).  Blas Decl. ¶ 2; *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106–07 (9th Cir. 2001); *Guzman v. Bridgepoint Educ., Inc.*, 305 F.R.D. 594, 608 (S.D. Cal. 2015) (excluding declaration from late-disclosed witness in class certification context).

(including those formerly employed by third-party vendors), "and the Court and its staff." Not. of Mot. at i–ii. For his proposed Rule 23(b)(2) class, Young requests an injunction requiring TikTok to implement workplace changes, *see id.* at 19, and abandons any explicit request for an injunction "ordering Defendants to establish a fund to pay for a medical monitoring program," SAC ¶ 191(f).

## IV.    STATEMENT OF ISSUE TO BE DECIDED UNDER RULE 7-4(A)(3)

Has Young proved that Rule 23's rigorous requirements have been satisfied?

## V.    ARGUMENT

Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). Certification is not proper unless, "after a rigorous analysis," the Court finds Young has satisfied those stringent requirements with evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). Young has not met that burden. Determining whether the elements of his negligence claim are satisfied for each member of the proposed class will require inherently individualized inquiries under the laws of states where class members worked. Rule 23(b)(2) certification is also inappropriate because Young lacks standing to seek prospective relief. And he is both an atypical and inadequate class representative because his experience is unique; he cannot represent anyone outside Tennessee; and he, unlike most other putative class members, is not subject to an arbitration agreement. Any of these reasons is sufficient to deny class certification.

### A.    Young's claim can't proceed on a classwide basis.

#### 1.    Every element of Young's negligence claim will require resolving highly individualized issues.

Rule 23 requires Young to do more than gesture toward questions capable of being phrased in common terms. Rather, he must show with evidence that there are in fact questions for which class adjudication will "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350. Young cannot satisfy this basic requirement. He identifies just two "common questions": (1) whether Defendants "owe a duty of care to the proposed class because they retain significant, if not exclusive, control of all material aspects of the work being done"; and (2) whether "Defendants breached that duty." Mot. at 17. He then asserts the "common" nature of these questions is "plain." *Id.* But *every*

element of his negligence claim requires resolving highly individualized inquiries. Young thus cannot satisfy Rule 23(a)'s commonality requirement, let alone Rule 23(b)(3)'s "even more demanding" predominance requirement. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).[4]

*Duty and retained control.* Young asserts a negligence claim on behalf of a nationwide class of people "who performed content moderation work for TikTok" but "were not directly employed by TikTok." Not. of Mot. at ii. The California Supreme Court has "endorsed a 'strong policy' of presuming that a hirer," like TikTok, "delegates all control over the contracted work, and with it all concomitant tort duties, by entrusting work to a contractor," like their content moderation vendors. *Sandoval v. Qualcomm Inc.*, 12 Cal. 5th 256, 270 (2021). To rebut that presumption, Young would have to prove TikTok (1) "retained control over the contracted work"; (2) "actually exercised that retained control"; and (3) "affirmatively contributed to [each] contract worker's injury." *Id.* at 274–76. The retained-control theory of liability applies "only if the hirer's exercise of . . . authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner." *Id.* at 275. For instance, "actively interfer[ing] with or arbitrarily assum[ing] to direct the employees of the independent contractor as to the manner and method of performing the work" may suffice to demonstrate retained control, *McDonald v. Shell Oil Co.*, 44 Cal. 2d 785, 791 (1955); retaining "the right to inspect, the right to stop the work, the right to make suggestions or recommendations as to the details of the work, and the right to prescribe alterations or deviations in the work" does not, *Sandoval*, 12 Cal. 5th at 274 (cleaned up). Whether TikTok retained control over each of the thousands of moderators who worked for one of eight vendors and exercised that control in a way that affirmatively contributed to each moderator's alleged risk of injury presents fact-intensive issues that cannot be decided "in one stroke." *Dukes*, 564 U.S. at 350.

To start, the degree to which TikTok retained control over any aspect of a moderator's work varied at the vendor-level. TikTok had fundamentally different business relationships with BPOs and TPAs. *See supra* at 3–4. ███████████████████████████████████████████

███████████████████████████ *See supra* at 3; Ex. 3 at 175–76. ████████████████████

---

[4] As discussed in Section IV.A(3), the putative class cuts across 24 states with different legal tests for retained control. For simplicity, the next section assumes without conceding California law applies.



*See supra* at 4.

Ex. 1 at 176–77; Ex. 4 at 133–34; Ex. 6 at 58; Ex. 20; Castaldo Decl. ¶¶ 8–9.

Feedback was given in different ways, too.

Ex. 6 at 34–36.

*See* Ex. 7 at 52–53, 72, 74, 93, 98–99. The extent of the TPAs' and TikTok's involvement in improving individual TPA moderators' performance varied by person. *See* Ex. 3 at 176; Ex. 7 at 75. These sorts of highly individualized facts would be relevant to answering the core questions of whether TikTok *actually exercised* any control over each moderator's work and whether that control *affirmatively contributed* to any asserted injury. To answer those questions, a factfinder would have to evaluate each moderator's working conditions at the time they performed their work

Class certification is inappropriate when "a fact-intensive inquiry into each potential plaintiff's employment situation" would be required. *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009); *see Casias v. Distrib. Mgmt. Corp., Inc.*, 2014 WL 12710236, at *19 (D.N.M. Mar. 31, 2014) (when court must analyze "actual day-to-day activities of the worker, individualized questions will likely predominate"). Courts thus regularly deny certification when the retained-control analysis would require "individual and fact intensive determinations." *In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*, 273 F.R.D. 499, 516 (N.D. Ind. 2010) (denying certification in employee misclassification case and explaining defendant's "actual exercise of control" over workers would require resolving "individualized issues"); *see also Casias*, 2014 WL 12710236, at *17 (similar). Here, too, the retained-control analysis would require examining the nature of TikTok's and each vendor's involvement in each moderator's daily work and working conditions, rendering class certification inappropriate.

**Breach.**  Young claims the issue of breach is common across the class, but the record confirms the answer to that question will also turn on individualized inquiries.  For example, Young claims TikTok breached its duty of care by providing "inexcusably poor training" to moderators.  SAC ¶ 13; *see, e.g.*, Mot. at 3.  Although TikTok provided certain training materials to BPOs and trained those vendors' trainers, ███████████████████████████████████████ Castaldo Decl. ¶ 10. ██████████ ███████████████████████████████████████████████████████████████████████ *Id.* Vaco's moderators, for instance, received "a mandatory wellness orientation," a "mandatory meet[ing] with a therapist session," and "a third training" to "help[] them in dealing with distressing content."  Ex. 10 at 55−56. ████████████████████████████████████ Ex. 8 at 128–30. ████ ████████████████████████████████████████████ Castaldo Decl. ¶ 10. ███████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Logsdon Decl. ¶ 8.  Moderators therefore could have different experiences in training, with some seeing only "mild" material and others seeing content some might find "uncomfortable."  That training could also differ by queue and over time. Ex. 6 at 57, 62−63; Ex. 7 at 34, 38–40; Castaldo Decl. ¶ 10.  Any analysis of whether TikTok breached its duty of care with respect to training would thus need to be resolved on an individual basis.

Young also claims TikTok breached its duty by setting "punishing" quotas for reviewing content. SAC ¶¶ 35, 59. ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████ *See supra* at 3–4.  Young testified (contrary to his allegations) that he ██████████ ████████████████████████████████████ Ex. 7 at 97–98. ████████████████████████████████████████████ *Id.* at 98–99.  Velez said ██████████████████████████████ Ex. 6 at 99.  Blake, in contrast, ██████████ ████████████████████████████████████████ Ex. 8 at 88.  Determining whether TikTok breached any duty as a result of the targets set for each of the *thousands* of moderators Young hopes to represent would require an individualized examination of countless factual variations of this sort, quickly overrunning the class proceedings.

Young vaguely alleges TikTok breached its duty of care in other ways, such as purportedly failing to implement technical safeguards in TCS, punishing moderators for taking breaks, requiring moderators to sign NDAs, and not providing an adequate "interview process." SAC ¶ 146. But his position ignores the evidence on each of these issues (*see supra* at 4–5, re safeguards; *infra* at 16–17, re vendor hiring practices; *supra* at 5–6, attesting to taking breaks; *supra* at 5–6, attesting to seeking counseling) and, more importantly, supplies no viable classwide method or evidence for assessing whether TikTok breached a duty to a given moderator. Where, as here, determining breach will require analyzing the conditions under which each moderator performed their content moderation work, courts have denied class certification. *See, e.g.*, *Anti Police-Terror Project v. City of Oakland*, 2021 WL 4846958, at *9 (N.D. Cal. Oct. 18, 2021) (denying certification of class injured by tear gas and explaining that "whether [the] City breached its duty of care to the class . . . will require individualized inquiries as to the circumstances under which tear gas was employed"); *Hunters Cap., LLC v. City of Seattle*, 2022 WL 1449387, at *11 (W.D. Wash. May 9, 2022) (commonality requirement not met when the elements of duty and breach for plaintiffs' negligence claim "cannot be resolved with generalized proof").

**Harm and causation.** Whether as an element of his claim or Article III standing, Young must show there is classwide evidence capable of resolving whether each moderator was harmed and how, if at all, TikTok's conduct contributed to or caused that harm. *Houghtailing v. Crown Equip. Corp.*, 2015 WL 1090386, at *2 (N.D. Cal. Mar. 12, 2015); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). But Young does not suggest those are common questions. Instead, repeatedly representing "[t]his case does not involve any claim for personal injury," Dkt. 129 at 3, Young insists every class member has suffered harm in the form of "an *increased risk* of developing serious mental health injuries." SAC ¶ 160 (emphasis added); *see* Mot. at 1. That argument depends on the assumption that simply being exposed to graphic or sensitive content necessarily puts everyone at "at risk" of developing PTSD and/or related conditions. But unless a plaintiff is seeking medical-monitoring relief (which Young no longer is, *supra* at 7, and, in any event, would be inappropriate classwide relief, *infra* at 20), he cannot recover for negligence without a present injury or a future injury that is "reasonably certain" to occur. *Bellman v. S.F. High Sch. Dist.*, 11 Cal. 2d 576, 588 (1938). And of course, "[e]very class member must have Article III standing in order to

11

recover individual damages," and that requirement must be satisfied through proof of an "injury in fact," not just an abstract "injury in law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427, 431 (2021); *see also infra* at 18–20 (discussing standing to seek injunctive relief).

The record here does not support Young's notion that merely doing moderation work—regardless of, for example, the nature of the content, the degree or frequency of exposure, the moderator's predispositions, the moderator's work environment, and the wellbeing benefits offered and used—automatically results in a "reasonable certainty" of psychological injury. As Young's expert Dr. Watson concedes, determining whether someone is at risk of developing trauma "depends on the type of trauma that they were exposed to, the length, the frequency, the intensity, and also . . . background history and psychological profile." Ex. 9 at 55−56; *see also* Ex. 15 ¶¶ 5(I), 6–13; Ex. 16 ¶¶ 47–48. And moderators saw different types of content at different frequencies and intensities, had different "background histor[ies] and psychological profile[s]," and different work environments as well. Ex. 16 ¶¶ 43–48. As a result, determining whether a moderator is "at risk" of developing a diagnosis like PTSD from moderation work—and whether they tried to prevent it—depends on a dizzying array of individualized questions.

*Types of content*.  Take the initial question of whether a moderator finds a particular type of content disturbing. Dr. Watson acknowledges "[p]redicting what will be traumatic and to whom is difficult." Dkt. 185-32 ¶ 2; Ex. 15 ¶¶ 5(I), 6–13; Ex. 16 ¶¶ 47–48; Ex. 9 at 61 (people can "have a broad range of reactions related to exposure to trauma"). And as TikTok's Global Lead of Wellbeing Partnerships explained, whether content is difficult to watch "is a subjective experience based upon many factors." Ex. 5 at 92. For example, a former Atrium content moderation team lead could recall only one occasion when a moderator told her about encountering difficult content:  the moderator happened to have a fear of snakes and reviewed "a live stream video of scientists working in a lab with snakes." Ex. 3 at 110. ████

████████████████████████████████████████████████████████████

████████████████████  Ex. 6 at 95–96. There is no evidence or reason to assume every moderator would find some piece of content disturbing; one former Atrium moderator, for example, never experienced distress from any content. Ex. 3 at 90–92; Logsdon Decl. ¶ 13. And even for moderators working on specialized queues with content escalated for further review, there is no guarantee they would have

necessarily seen certain types of graphic content. Ex. 2 at 64–65. Young presents no classwide method for establishing what, if any, kind of content a moderator may find distressing, much less the degree of distress they might experience. TikTok accordingly would be entitled to question each class member about what they reviewed and how they reacted to it, rendering any class trial unmanageable.

*Tooling*. Whether class members were, in fact, negatively affected by content they saw would also vary substantially based on their choice to use available content moderation tooling (e.g., muting audio). *See supra* at 4; Ex. 12; Ex. 10 at 55–16. As Dr. Watson admitted, "tooling enhancements can mitigate the harmful effects of constantly viewing potentially traumatic materials." Dkt. 185-32 ¶ 14; *see also* Ex. 16 ¶¶ 26–29. Viewing a bloody image in grayscale may, for example, mitigate the potential shock of seeing it. Ex. 16 ¶ 27. Moderators had access to different types of software with different tooling at different times, which could alter the appearance of content. *See supra* at 4. As a result, even if two moderators saw the same content in TCS (which is unlikely), those moderators could have viewed the content in a different way. One moderator may have turned the video to grayscale and turned off any audio, while another, like Young, may have watched it without altering the video's presentation at all. Ex. 7 at 94. And even if two moderators used the same tooling, as Dr. Watson explained, "some [types of tooling] are helpful for some people and others aren't." Ex. 9 at 114. These differences matter when trying to determine how each moderator may have perceived the same content.

*Background conditions and psychological profile*. Each moderator's pre-existing mental health and other socioeconomic conditions also affect whether and to what degree they are disturbed by content and the resulting effects, if any. *See* Ex. 15 ¶¶ 6–8; Ex. 16 ¶¶ 47–48. As an article Dr. Watson cites explains: "Personal choices about what was tolerable [to view] . . . *clearly varied* from interviewee to interviewee, *including as a result of pre-existing circumstances or vulnerabilities*." Dkt. 185-32 at 202 (emphasis added). That same variation exists in the proposed class. Young, for example, ██████████████ ██████████████████████████████████ Ex. 7 at 141–43. ██████████████████ ████████████████████████████████████████████████████████ *Id.* at 162–63. Other moderators have different mental health backgrounds, and some may have never struggled with mental health issues in the past. Ex. 8 at 20, 117. Moderators' pre-existing mental health status will contribute

to their future mental health status, Ex. 15 ¶¶ 6–8; Ex. 16 ¶¶ 47–48, and there is no way to determine each putative class member's prior (or future) mental health status without a mini-trial as to each one.

_Access to and use of wellbeing benefits_.  Finally, moderators had access to different benefits to cope with exposure to disturbing content.  Ex. 16 ¶¶ 50–53.  The vendors provided a mix of resiliency training, wellbeing activities, counseling, and other resources intended to offset any job stress and build resiliency.  Ex. 12; Ex. 16 ¶¶ 50–53.  In addition, individual moderators' _use_ of the offerings varied, as did what offerings each moderator found helpful.  For instance, Velez ██████████████████

███████████████████████████████████████████████████████ *See*

*supra* at 5.  Blake ███████████████████████████████████████

██████████████████████████████████ Ex. 8 at 91, 93.  Young ███████████████████

██████████████████████████████████████████

*See supra* at 5; Ex. 7 at 63, 84−85.  Put simply, moderators are all over the map in terms of whether they used the different wellbeing benefits offered to them by their employers and whether they found those benefits helpful.  Young provides this Court with no way to manage this variation in a class proceeding.

Indeed, Young, Velez, and Blake's testimony shows why the question of whether a moderator suffered the type of harm for which Young seeks to recover—i.e., an "increased risk" of developing a disorder like PTSD—is insusceptible to classwide proof.  Velez ████████████████████████

███████████████████████████████████████████

█████████████████████████ *See supra* at 5.  Blake ██████████████████████

███████████████████████████████████████████

███████████████████████████████████████ *See supra* at 6; Ex.

8 at 50, 74–75.  Young ████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████ *Supra* at 5; Ex. 7 at 180–81.

Deciding whether any of these moderators are "reasonably certain" to develop a mental health condition and, if so, whether their content moderation work was a "substantial factor" in causing that risk such that they could be entitled to relief will "inescapabl[y]" demand examination of highly individualized

evidence, thereby defeating commonality and predominance. *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001); *see also, e.g.*, *Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899, *4 (N.D. Cal. Aug. 28, 2002) (denying certification of medical-monitoring class where elements of causation and purported "increased need for medical monitoring" would require "a particularly individualized inquiry"); *Bellman*, 11 Cal.2d at 588 (reversing and remanding damages award in negligence case where purported harm was not "reasonably certain" to occur). Certification should be denied on that basis alone.

Even setting aside the harm element of his state-law negligence claim, Young, as the proposed class representative, faces the added challenge that ███████████████████████████████████ ████████████████████████ so any risk of future injury is too remote and uncertain to be "imminent" under Article III. *Az. All. for Retired Americans v. Mayes*, — F.4th —, 2024 WL 4246721, at *5 (9th Cir. Sept. 20, 2024); *see supra* at 5; Ex. 15 ¶ 21; *cf. In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 926 (N.D. Cal. 2015) ("The absence of an injury requirement under state law does not . . . trump the constitutional standing requirements."). Young therefore lacks standing to seek any form of relief, whether for himself or the proposed class. *See infra* at 18–20. The Court would need to go through this two-step analysis—i.e., determining if someone suffers from an "actual," or present injury, and if not, determining if that individual faces an "imminent" harm—for each person seeking relief. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.12 (9th Cir. 2022) (Rule 23 "requires" determining "whether individualized inquiries into th[e] standing issue would predominate over common questions."). Those inquiries aren't common across the class, either.

***Knowledge of risks.*** Even if Young had offered classwide answers to the questions of duty, breach, harm, and causation, he would still need to contend with the fact that whether each class member can recover from TikTok will depend on their knowledge that, by agreeing to moderate content, they may see disturbing content. Any class member who was aware of that risk but agreed to moderate content anyway would be barred from recovery. *See, e.g.*, *Knight v. Jewett*, 3 Cal. 4th 296, 308 n.4, 325 (2006).

Courts have denied class certification when, as here, they would need to individually analyze whether class members had some responsibility for their claimed injury and, if so, to what degree. *See Barraza v. C. R. Bard Inc.*, 322 F.R.D. 369, 380–81 (D. Ariz. 2017) (denying certification when court

would have to analyze, among other things, "what each class member . . . knew about the risks" and "when they knew it"); *Guillory v. Am. Tobacco Co.*, 2001 WL 290603, at *8 (N.D. Ill. Mar. 20, 2001).

The same is true here: each vendor described the nature of the work and associated risks to job applicants in different ways that changed over time. For example, ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 18; Declaration of Joyce Batka. Atrium's job posting stated the work could require reviewing content "often of a graphic nature," and listed the "[a]bility to work through invasive/disruptive content" as a job responsibility. Ex. 17. This information was reiterated during the interview process—in some cases more than once, depending on the interviewer. Ex. 7 at 22–24. Intellipro moderators, as part of their job "offer package," "either executed or acknowledged [a] notification" disclosing potential exposure to "disturbing and illegal content." Dkt. 142-5, APP001−02. Vaco, for its part, would "verbally . . . make it very clear as to exactly what" general kinds of content moderators could see, including "some of the worst things" they could see. Ex. 10 at 46–47. In short, there are different facts supporting defenses on TikTok's part that individual moderators knew the risks and chose to do the work anyway across the proposed class.

The testimony to date has confirmed that, to the extent moderators dispute whether they knew about the risks of the job before starting it, resolving those disputes will require individualized factfinding into issues such as what a moderator was told about the job, what they understood the job entailed, and any written or other acknowledgements about the job duties. Young testified ██████████████ ████████████████████████████████████████████████████████████████ ████████████████ Ex. 7 at 23–24. He has now submitted a declaration contradicting this testimony, claiming he saw a graphic video but "did not receive any warning that [he] would be exposed to content like this at Atrium." Dkt. 185-36 ¶¶ 5–6. Velez admitted ████████████████████████ ████████████████████████████████████ and signed an acknowledgement stating she "read the job description for [her] position, underst[ood] [her] job responsibilities[,] and agree[d] to perform the essential functions outlined." Ex. 6 at 54–55; Dkt. 80-2 at ECF 8. Indeed, ████████████████████████

16

████████████████████████████████████████████████████████████

████████████████████████████████████████  Ex. 6 at 55–56.  In contrast, Blake, the former

TPUSA employee, testified ████████████████████████████████████████████████

████  Ex. 8 at 36, 133−34; Dkt. 185-35 ¶ 6.  TikTok has the right to explore what each moderator knew

about the risk of the job, and resolving those defenses will require examination of individual-specific facts

(and likely credibility determinations) that will quickly overwhelm a class trial.

   *Damages*.   Finally, given the unavoidably individualized issues with respect to harm and

causation, as well as with assumption of risk/comparative fault, it is unsurprising that Young has failed to

proffer any damages model for his Rule 23(b)(3) class.  But that is another independent reason to deny his

motion.  "At class certification, a plaintiff must present a likely method for determining class damages."

*Chavez v. Blue Sky Natural Beverage Co*., 268 F.R.D. 365, 379 (N.D. Cal. 2010) (cleaned up).  When

there is "[n]o damages model," there is "no predominance, [and] no class certification."  *In re Rail Freight

Fuel Surcharge Antitrust Litig*., 725 F.3d 244, 253 (D.C. Cir. 2013).  Here, the variation in whether a

putative class member has been harmed (under a "risk" theory or otherwise) and, if so, to what degree,

underscores the importance of having a classwide damages model.  Without one, "individual damage

calculations will inevitably overwhelm questions common to the class."  *Comcast*, 569 U.S. at 34; *see

also In re Flash Memory Antitrust Litig*., 2010 WL 2332081, at *12 (N.D. Cal June 9, 2010) (denying

certification where the proposed damages methodology "would . . . sweep in an unacceptable number of

uninjured plaintiffs").  Class certification is inappropriate for this reason as well.  *See, e.g.*, *D.C. ex rel.

Garter v. Cnty. of San Diego*, 783 F. App'x 766, 767 (9th Cir. 2019) (class certification inappropriate

when plaintiffs sought damages in connection with "emotional distress" and "humiliation"); *Smilow v.

Sw. Bell Mobile Sys*., 323 F.3d 32, 40 n.8 (1st Cir. 2003) (noting in its discussion of damages that "[c]ourts

have denied class certification where these individual issues are especially complex or burdensome").

   **2.     The injunction Young seeks underscores why certification is inappropriate.**

   Young vaguely calls for injunctive relief in the form of "proper procedures, safeguards and tools."

Mot. at 19.  Although it's unclear what exactly he wants the Court to order, to the extent he seeks an

injunction based on his experts' proposals, those proposals overlook important variations in vendors'

workplace environments and structure; fail to account for the evolving wellbeing practices in the industry; and would inhibit TikTok's and its vendors' ability to tailor their practices as the field of content moderation continues to evolve. *See* Ex. 16 ¶¶ 32–60; Ex. 9 at 152 (Young's expert admitting TikTok, in partnership with its vendors, is best-positioned to determine how to support moderator wellbeing).

Whatever form of injunction Young seeks, though, a Rule 23(b)(2) class is inappropriate for at least two reasons. First, as noted above, Young is no longer a content moderator and so lacks standing to seek an injunction requiring TikTok to impose additional requirements on its vendors. *See infra* at 18–20. Second, to the extent Young still seeks, or wants to leave open the option of seeking, medical-monitoring relief, he has forfeited his ability to do so by not even attempting to show it would be a proper form of classwide relief here. *See supra* at 7; *see, e.g.*, *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *25 (N.D. Cal. May 8, 2018) (denying certification of Rule 23(b)(2) class where plaintiffs failed to "explain[] why injunctive relief is warranted[] or even request[] it"). And even if he had not forfeited the issue, that relief would be essentially monetary in nature and thus inappropriate for Rule 23(b)(2).

**Vendor relationship changes.** A named plaintiff who does "not have standing to seek injunctive relief" "will not adequately protect the interests of the class as a whole" and therefore cannot establish Rule 23's adequacy requirement. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011); *see also, e.g.*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (similar). Every plaintiff must establish constitutional standing, whether they are suing on an individual or class basis. *See, e.g.*, *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n.20 (1976) ("That a suit may be a class action . . . adds nothing to the question of standing."). And "[a] class of plaintiffs does not have standing to sue if the named plaintiff does not have standing." *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999). Because Young does not have standing to seek forward-looking injunctive relief, he is not an adequate representative for an injunctive-relief class, no matter what form that relief might take.

Former employees generally cannot seek injunctive relief on behalf of a class. *See, e.g., Dukes*, 564 U.S. at 364–65 ("those who left their Wal-Mart jobs since the complaint was filed" and "those who left beforehand" lacked standing to sue for injunctive relief under Rule 23(b)(2)); *see also Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 865 (9th Cir. 2017) ("a former employee has no claim for injunctive

relief addressing the employment practices of a former employer").  It is undisputed that Young:  was not a content moderator when he sued, █████████████████████████████████████████████████

███████████████████████  *See supra* at 5; Ex. 7 at 102–03, 105.  Young therefore cannot show standing to seek forward-looking changes to how TikTok works with its vendors.  *See, e.g.*, *Hightower v. JPMorgan Chase Bank, N.A.*, 2012 WL 12878311, at *4 (C.D. Cal. Sept. 12, 2012); *Howard v. Hain Celestial Group, Inc.*, 2024 WL 718180, at *2 (N.D. Cal. Feb. 22, 2024).

Young argues he need not demonstrate a "real or immediate threat" of suffering future harm because TikTok purportedly "can open and close their vendors any time they wish, making them capable of destroying the ability of any class member to ever bring a claim against them."  Mot. at 19–20.  That argument tilts at windmills:  it's *Young's* choices, not TikTok's, that deprive him of standing.  What's more, the two cases he cites confirm the weakness of his argument.  First, in *B.C. v. Plumas Unified School District*, 192 F.3d 1260 (9th Cir. 1999), the Ninth Circuit held the named plaintiff could not demonstrate a "real or immediate threat" of being subjected to "an illegal dog sniff of his person," because he was no longer a student in the defendant school district and had "no plans to return" there.  *Id.* at 1264.  Young is in the same boat:  he is no longer subject to the policies or practices he challenges ████████████████

████████████████████████  Second, in *Doe v. Wolf*, 424 F. Supp. 3d 1028 (S.D. Cal 2020), the district court held the plaintiffs did not need to show a "real or immediate threat" because they were still "being subjected to the practice they were challenging" when they sued—i.e., the plaintiffs' claims were about present and ongoing harm, not potential prospective harm.  *Id.* at 1037.  At the time he sued, Young was not employed by Atrium to moderate TikTok content, and so was not "being subjected to the challenged policies."  *See supra* at 5.  He therefore lacks standing under *B.C.* and other Ninth Circuit cases that reach the same conclusion.  *See, e.g.*, *Ellis*, 657 F.3d at 986; *Bayer*, 861 F.3d at 865.

Young also claims he does not need to establish standing due to supposed "barriers" to others who may wish to bring suit, including possible retaliation for filing suit, confidentiality agreements that purportedly discourage others from coming forward, and TikTok's decision to close vendor sites in the past.  Mot. at 19–20.  But he offers no evidence that any of this deterred anyone from coming forward.  In any event, the Supreme Court has repeatedly rejected this argument, holding "[t]he assumption that if

[plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974); *see also, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013) (same).  This Court should do the same here.

In addition, Young cannot establish his requested changes are appropriate for the entire class, as required under Rule 23(b)(2).  "Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.  Young's proposed class, however, includes those who, like him, have left their content moderation jobs and have no plans to return.  Blake, for instance, ███████████████████████████████████████████████████████

███████████████████  Ex. 8 at 42–44.  Velez left Telus in 2021 and ████████████████████

████████████████████  Ex. 6 at 21.  Any change to how TikTok operates vis-a-vis its vendors in the future would thus fail to "provide relief to each member of the class."  *Dukes*, 564 U.S. at 360.

***Medical-monitoring relief.***  As discussed, Young has abandoned the medical-monitoring fund sought in his complaint.  *Supra* at 7.  Nevertheless, there are two additional reasons why that relief would be inappropriate.  First, it's called a medical-monitoring "fund" because it is principally a form of monetary relief and so is inappropriate for certification under Rule 23(b)(2).  *Zinser*, 253 F.3d at 1194.  Second, there is no way to determine whether such relief is appropriate on a classwide basis as required under Rule 23(b)(2).  *Dukes*, 564 U.S. at 360.  California law requires proof of a "need for future monitoring [as] a reasonably certain consequence of a plaintiff's toxic exposure."  *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1009 (1993).  But a court cannot resolve in one fell swoop whether every would-be class member is "reasonably certain" to need such monitoring.  *See supra* at 11–15.  For these reasons, courts regularly decline to certify classes seeking medical-monitoring relief.  *See, e.g.*, *Zinser*, 253 F.3d at 1194; *O'Connor v. Boeing N. Am., Inc.*, 180 F.R.D. 359, 379 (C.D. Cal. 1997).

### 3.    Choice of law issues involving 24 states also preclude certification.

Young's pursuit of a nationwide class of moderators spread across 24 different states, *see supra* at 6, only amplifies the individualized issues.  Courts routinely deny certification when variations across the law of relevant states, along with choice-of-law issues, prevent efficient classwide adjudication.  *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1199 (9th Cir. 2024); *see Pilgrim v. Universal*

*Health Card, LLC*, 660 F.3d 943, 948–49 (6th Cir. 2011) (collecting appellate decisions). Indeed, this Court has recognized the importance of addressing these issues head-on. J. Chhabria Civil Standing Order ¶ 52. Yet Young provides no plan showing how they can be resolved. This is yet another independent reason to deny certification.

Young assumes California law will govern every class member's claim. While the Court assumed California law would govern Young's individual claim in resolving TikTok's motion to dismiss, it also indicated the same cannot be assumed for each class member. Dkt. 69 at 3. Rightly so: which state's laws will apply depends on a complex choice-of-law analysis Young makes no effort to engage with.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Klaxon Co. v. Stentor Elec. Mfg. Co. Inc.*, 313 U.S. 487, 496 (1941). To determine the controlling substantive law, California courts (1) determine if there's a conflict between California and foreign substantive law, (2) identify the foreign jurisdiction's interest in applying its own law, and (3) balance the "comparative impairment" of the interested jurisdictions and apply the law of the jurisdiction whose interest would be more impaired if its law was not applied. *Zinser*, 253 F.3d at 1188. Here, the first step of the analysis alone reveals why choice-of-law issues preclude certification. *See* App'x. A few examples illustrate the complexity of these issues:

**Retained control.** States take different approaches to the issue of retained control. Colorado, for example, has not adopted the Restatement's guidance for retained control. Instead, Colorado considers direct employer liability through several distinct tests, none of which is implicated here. *See, e.g.*, *Veintimilla v. Dobyanski*, 975 P.2d 1122, 1123 (Colo. Ct. App. 1997) (vicarious liability); *Wright v. TEGNA Inc.*, — P.3d —, 2024 WL 2967049, at *9–10 (Colo. Ct. App. June 13, 2024) (negligent hiring and supervision). In Arizona (where Alorica operates, for example), an employer who retains the right to control how its contractor performs its work, but doesn't actually exercise that control, may be liable for negligence. But that same employer would not be liable in California. *See* App'x, Chart B; Dkt. 184-7 at 6. An employer who actually directed how the contractor should perform its work would not be liable in California if that direction did not "affirmatively contribute[]" to the contractor's harm—but that same employer may be in Maryland. *See* App'x, Chart B. Similarly, an employer who retained control over a

contractor's safety policies may be liable in Arizona even if the employer merely failed to prevent the contractor's injury, *see* App'x, Chart B, but would not be liable in California unless they "induced—not just failed to prevent—the contractor's injury-causing conduct." *Sandoval*, 12 Cal. 5th at 277.

**Defenses to duty.**  The variability and viability of TikTok's defenses among the 24 states likewise will preclude a class proceeding from generating "any common answers," as detailed in the Appendix. *Dukes*, 564 U.S. at 350.  For one thing, California law precludes liability when an injury arises "from the very condition or hazard the defendant has contracted with the plaintiff to remedy or confront." *Harry v. Ring the Alarm, LLC*, 34 Cal. App. 5th 749, 759−60 (2019).  In contrast, New Mexico rejects "special no-duty rules shielding defendants who injure employees engaged in these inherently risky occupations." *Baldonado v. El Paso Nat. Gas Co.*, 143 N.M. 297, 302 (N.M. Ct. App. 2006).  And because most states have adopted comparative negligence regimes, the assumption-of-risk defense has splintered into primary versus secondary, express versus implied, and reasonable versus unreasonable variations.  *See* App'x, Chart B.  TikTok has a due process right "to litigate its . . . defenses to individual claims," *Dukes*, 564 U.S. at 367, but Young's proposed California-law-only class would prevent TikTok from doing so.

Young asserts offhandedly that the relevant states' laws are the same because "they all derive from Restatements."  Mot. at 16.  That's factually inaccurate (*see supra* at 21), but regardless, Young's paltry treatment of state-by-state variation alone is "fatal to [his] bid for class certification."  *Dent*, 2023 WL 2983580, at *1 (variations among the 23 states' laws would make class proceedings a "sprawling train-wreck").  If plaintiffs seeking nationwide classes don't "demonstrate[] how the [proposed class] could be certified" based on "nuanced consideration of different states' laws," they aren't entitled to certification. *White*, 104 F.4th at 1200–01.  Young's motion lacks any of that necessary analysis.  This deficit is all the more striking given that the Ninth Circuit has held "the laws of negligence . . . all differ in some respects from state to state." *Zinser*, 253 F.3d at 1188.[5]  The Court "cannot rely merely on assurances of counsel that any problems with predominance or superiority can be overcome" when plaintiffs seek to certify such a sweeping class.  *Id.* at 1189; *see also Dent v. NFL*, 2021 WL 3885954, at *9 (N.D. Cal. Aug. 31, 2021)

---

[5] Even if Young hadn't abandoned his request for medical-monitoring relief, courts routinely find that the "[d]ifferences in state law" with respect to such relief preclude common answers.  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *see also* App'x, Chart A (illustrating state-law variation).

(denying certification notwithstanding counsel's assurances "that every jurisdiction in the United States has based its voluntary negligence law off of Restatement[s]"; noting plaintiff could not "simply assume[] away the problem"), *aff'd*, 2023 WL 2983580 (9th Cir. Apr. 18, 2023).

Young further argues California law should apply because "Defendants are California corporations based in California." Mot. at 16. But "when the subject matter of the litigation occurred outside of California and the only connection to California is a corporation's principal place of business, California does not have a sufficient interest in applying its law." *Nelson v. F. Hoffmann-La Roche, Inc.*, 642 F. Supp. 3d 1115, 1131 (N.D. Cal. 2022); *see also Lewallen*, 2002 WL 31300899, at *5 (rejecting that "California law will apply to all members' claims merely because the defendants are located in California"); *Howe v. Diversified Builders, Inc.*, 262 Cal. App. 2d 741, 745−46 (Cal. Ct. App. 1968). Here, fewer than 400 putative class members resided and/or performed their content moderation work in California. Dkt. 142-2; Dkt. 142-5, APP001−02; Ex. 21. For the remaining 12,200+ class members, the only connection their claims would have to California is the fact that TikTok's principal place of business is here, which is insufficient to apply California laws to far-flung class members' claims. Rather, the states where moderators resided and performed their work "ha[ve] an interest in having [their] law[s] applied to [their] resident[s]." *Zinser*, 253 F.3d at 1187. Young ignores those states' interests entirely.

### B.    Young is an atypical and inadequate class representative.

A court may certify a class only if the representative will "adequately protect the interests of the class" and only if his "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a). In addition to lacking standing to seek prospective relief (*see supra* at 18–20), Young is an atypical and inadequate class representative because: (1) his content moderation experience is atypical; even if it weren't, (2) he cannot represent putative class members outside of Tennessee, and (3) he cannot represent the thousands of class members subject to arbitration agreements.

***Unique experiences, defenses, and injuries.*** Young cannot establish typicality because his content moderation experience is unique as compared to the proposed class he seeks to represent. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured

by the same course of conduct." *Ellis*, 657 F.3d at 984 (internal quotations omitted).  "[W]here there is no evidence of a common experience shared by all [putative class members], there can . . . be no 'typical' class representative." *Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001).  Here, Young seeks to certify a class of over 12,600 current and former employees of eight different vendors who employed moderators that have vastly different roles (i.e., moderator, quality assurance analyst, trainer), backgrounds (mental health and otherwise), and moderation experiences.  *See supra* at 7–17.  As in *Donaldson*, there is no "typical" class experience here, and even if there were, Young's experience wouldn't fit the bill.  Consider just three ways in which Young's experience renders him atypical:

*First*, while over 97% of the proposed class are current or former BPO content moderators, Dkt. 142 at 4–5, Young was a TPA moderator, *see supra* at 5.  And that difference matters, for the reasons given above.  *See supra* at 8–11; *Ellis*, 657 F.3d at 984.

*Second*, as a moderator, Young didn't use the TCS software he discusses at length.  Instead, he viewed content in a materially different program called Lighthouse and moderated content using an Excel spreadsheet.  Logsdon Decl. ¶ 11.  And though he used TCS in his quality assurance role, he wasn't subject to the same kind of performance metrics that typical content moderators were.  *Id.*

*Third*, Young claims he is at "an increased risk of developing serious mental health injuries," *see supra* at 6, but that only puts his interests in conflict with those of class members who may claim *present* harm.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982).  In *Amchem Products v. Windsor*, 521 U.S. 591 (1997), the Supreme Court held the named plaintiffs alleging present harm could not adequately represent class members who only alleged a risk of *future* harm, because there was a conflict of interest:  individuals with present injuries would have an interest in seeking maximum present payout and little interest in long-term monitoring, while individuals with only a risk of future harm would care primarily about trading immediate relief for long-term monitoring.  *Id.* at 625–27.

This case presents the same conflict, but running in the other direction.  Young has no present injury and claims only a risk of future harm; other moderators may claim they have current mental health harms.  *See supra* at 5–6.  Young can't recover compensatory damages since he claims no present harm, but members of the class who claim present harm may wish to seek those damages.  This conflict within

the putative class precludes a finding of adequacy. *See, e.g.*, *Rollins v. Dignity Health*, 336 F.R.D. 456, 467 (N.D. Cal. 2020) (denying certification for lack of adequacy because of "a fundamental conflict of interest" between recovery incentives). And these same differences in harm also preclude Young from establishing typicality. *See, e.g., Gardner v. Health Net, Inc.*, 2010 WL 11579028, at *4 (C.D. Cal. Sept. 13, 2010) (denying certification for failing to show class members "suffered from the same or similar injury"); *Poe v. Nw. Mut. Life Ins. Co.*, 2023 WL 5251875, at *6 (C.D. Cal. Aug. 14, 2023) (similar).

    ***Inadequate to represent class members outside Tennessee.*** "Whether a plaintiff can bring claims on behalf of unnamed plaintiffs under the laws of states in which the named plaintiff does not reside or was injured is a matter of typicality, adequacy, and predominance." *Sultanis v. Champion Petfoods USA Inc.*, 2021 WL 3373934, at *6 (N.D. Cal. Aug. 3, 2021). "[I]t is a rare case in which the Court would allow a plaintiff from one state to represent a nationwide class." *Maketa v. Target Corp.*, 2024 WL 4311702, at *4 (N.D. Cal. Sept. 26, 2024). For the entire time Young was employed by Atrium, he lived in Tennessee, worked in Tennessee, and experienced every alleged harm and wrongful act in Tennessee. Ex. 7 at 9, 21–22. Given the substantial variation in the various states' laws, including what class members must prove and what defenses TikTok can assert, *see supra* at 20–23, App'x, Young "cannot represent unnamed class members in states outside of [Tennessee]." *Phan v. Sargento Foods, Inc.*, 2021 WL 2224260, at *13 (N.D. Cal. June 2, 2021); *accord, e.g.*, *Sultanis*, 2021 WL 3373934, at *7–8.

    ***No arbitration agreement.*** Finally, as detailed in previous briefing that TikTok expressly incorporates by reference here, Young is not typical or adequate because he—unlike more than 65% of the putative class—is not subject to an arbitration agreement. *See* Dkt. 142 at 7–9; Dkt. 157 at 5–7; Dkt. 168. He therefore cannot represent a class containing members who are subject to such agreements. Even if he could, the arbitration agreements binding over 8,500 putative class members present individualized issues about the enforceability of those agreements that preclude any finding of predominance or superiority under Rule 23(b)(3). *See* Dkt. 142 at 9–11; Dkt. 157 at 6–7; Dkt. 168.

## VI.    CONCLUSION

    Because Young has not carried his evidentiary burden to prove that this case should proceed as a class action, the Court should deny his motion.

DATED: October 28, 2024                    Respectfully submitted,

                                           GIBSON, DUNN & CRUTCHER LLP

                                           By: _____*/s/ Lauren M. Blas*_____
                                                           Lauren M. Blas

                                           *Attorneys for ByteDance Inc. and TikTok Inc.*