Steven N. Williams (SBN 175489)
**STEVEN WILLIAMS LAW, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: 415-697-1509
Fax: 415-230-5310

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **REECE YOUNG,** an individual, | Civil Action No. 3:22-cv-01883-VC |
| *Plaintiff*, | |
| v. | **THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **BYTEDANCE INC. and TIKTOK INC.,** corporations, | |
| Defendants. | |

Plaintiff Reece Young files this Third Amended Complaint against Defendants ByteDance Inc. ("ByteDance") and TikTok Inc. ("TikTok") (collectively referred to as "TikTok" or "Defendants") for negligence and intentional infliction of emotional distress under Tennessee law. Plaintiff demands a trial by jury. Plaintiff makes the following allegations based on personal knowledge as to the facts pertaining to himself and upon information and belief, including the investigation of counsel, as to all other matters.

## I.    PARTIES

1. Plaintiff Reece Young is a resident of Nashville, Tennessee. For approximately 11 months, starting in 2021, Plaintiff Young worked as a content moderator reviewing content for TikTok. He did this at home, using software provided by TikTok. Mr. Young was part of what TikTok referred to as the "Nashville TnS" team. "TnS" stands for trust and safety.

2. Defendant ByteDance, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California.

3. Defendant TikTok, Inc. is, and at all relevant times was, a California corporation with its principal place of business at 5800 Bristol Pkwy, Culver City, Los Angeles County, California. Defendant TikTok also maintains offices in Palo Alto, California and Mountain View, California. TikTok is owned by ByteDance.

4. The amount of content on TikTok is massive, with TikTok having more than a billion videos viewed on its platform each day and millions of active users. Consequently, the volume of content that content moderators review is massive.

## II.    JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because Plaintiff is a citizen of Tennessee and Defendants are citizens of California.

Case no. 22-cv-01883-VC
Third Amended Complaint

6. This Court has personal jurisdiction over Defendants because: (i) they transact business in the United States, including in this District; (ii) they have substantial aggregate contacts with the United States, including in this District; (iii) they engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including in this District, and purposely availed themselves of the laws of the United States. Defendant ByteDance is headquartered in this District and regularly conducts business here.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District. Defendant ByteDance transacts business, maintains substantial contacts, and committed tortious acts in this District, causing injury to persons residing in, located in, or doing business throughout the United States. Defendant ByteDance is headquartered in Mountain View, in this District, and conducts substantial business activities here. Plaintiff was injured as a result of Defendant ByteDance's illegal conduct in the Northern District of California.

### III.    FACTUAL ALLEGATIONS

8. TikTok is one of the most popular social media apps in the world. Plaintiff was hired through Atrium Staffing Services, Ltd., a placement agency, to work for TikTok as a content moderator in Nashville, Tennessee. He was solicited for the job through a direct message on LinkedIn from a recruiter, had a very brief interview, and was hired. Mr. Young worked directly with and for TikTok. He was considered part of the Nashville TnS Team.

Case no. 22-cv-01883-VC
Third Amended Complaint

9. TikTok controlled every meaningful aspect of Plaintiff's work other than the delivery of Plaintiff's pay. TikTok provided the tool to do the job, set the quotas to do the job, set the accuracy requirements for the job, and fed offensive and harmful content to Plaintiff through their tool at a rate, pace and frequency which TikTok knew, or should have known, would cause harm. TikTok failed to provide reasonable safeguards, which it knew would mitigate the harm that it was causing to Plaintiff.

10. While working at the direction of Defendants, Plaintiff saw many acts of extreme and graphic violence. As just a few examples, Plaintiff saw a thirteen-year-old child being executed by cartel members, bestiality and other traumatizing content. Plaintiff was not properly warned by TikTok of what he would see, either in his interview, training materials or in any other way. The actual content he saw was shocking, disturbing and harmful, in contrast to suggestions before he began work that content would be relatively mild. As a result of the repeated, unmitigated, and unprotected exposure to harmful conduct through Defendants' conduct Plaintiff suffered injuries.

11. During his deposition in this case, Plaintiff described the type of content that he saw:

> . . . this video surfaced of a cartel, rival cartel in Mexico, capturing a 13-year-old girl of another rival cartel and killing her on camera, just slowing slitting her throat with the dullest knife, and that happened kind of overnight and got reposted countless times, and I had to watch it every single repost of the video for hours pretty much, an entire shift -- taking them all down, even though I knew it was coming, but it required of me contractually to watch the entire video, so that

Case no. 22-cv-01883-VC
Third Amended Complaint

was one instance.

There were multiple counts of pornographic child sexual abuse videos that I remember. A ton of terrible videos of children being abused sexually. Without having to go into further detail, I mean, it was definitely some of the worst stuff I've ever encountered. And then I had to watch each video to its completion every time, but that was – that happened on multiple occasions. Tons of a lot of murder and suicide human death. The suicide stuff, anything from hangings or pill consumption or gunshots, pretty much any way imaginable you could end your own life. Murders, a lot of gang violence, a lot of down right stabbings, murders, gunshots, tons of stuff like that that you have to watch to completion.

12. At the time that Mr. Young worked for Atrium, TikTok knew that the work he was doing was harmful, that he needed appropriate well-being services, and that he was not receiving them. In a high-level document prepared in August of 2021, during Mr. Young's tenure as a content moderator, executives at TikTok discussed the proposition of converting people like Mr. Young into full-time TikTok employees so that they could receive adequate safeguards and well-being services, unlike their status working for a "staffing agenc[y]" that was "inadequately equipped to do so." In this document, the executives noted that "[w]ellness is vital for TnS team members. Currently TPAs do not receive wellness services. The need for FTE conversion to allow for wellbeing services is necessary." "TnS" refers to the Trust and Safety Team, which includes content moderators, while TPAs specifically refers to people like Mr. Young who were hired by the placement agencies Atrium and Intellipro. A true and correct copy of the document referenced in this paragraph is attached hereto as Exhibit A. Even though TikTok knew that this conversion was necessary to

provide proper care to content moderators like Mr. Young, it never followed through with the conversion.

13. Content moderators also face repeated exposure to conspiracy theories, including but not limited to suggestions that the COVID-19 pandemic is a fraud, genocide deniers, false flag stories and other damaging distortions of present events and historical events, "challenges" that involve high-risk behavior, fringe beliefs, hate speech, and political disinformation about census participation, candidate citizenship status or eligibility for public office, and manipulated videos of elected officials. This type of content can and does cause traumatic reactions.

14. Defendants are and were aware of the negative psychological effects that viewing graphic and objectionable content has on content moderators. Defendants are and were aware of ways to mitigate the risk of harm and to ameliorate the harm that is caused. Despite this knowledge, Defendants did not implement acknowledged standards of care to protect content moderators from harm, including standards of care they have publicly endorsed

15. Defendants rely on users to report inappropriate content. Defendants receive millions of user reports of potentially objectionable content on the App. These videos are then flagged for review by content moderators to determine if the content violates Defendants' policies. Human moderators review the reported content – sometimes thousands of videos per shift – and remove videos that violate the Defendants' terms of use, with posts often containing graphic content.

16. Plaintiff reviewed content through TikTok's proprietary TCS software. Plaintiff would spend his days watching graphic content while being monitored through the TCS software.

17. Plaintiff would be required to test his accuracy in flagging content against results

obtained by other moderators. This included weekly quizzes administered by Defendants. Moderators are expected to review a very large amount of videos per day and to achieve accuracy rates of up to 90%. All of this was imposed by Defendants and enforced by Defendants, not Atrium.

18. Plaintiff did his work through Defendants' proprietary TCS software. It is through TCS that videos are sent to the content moderators, specifically in the form of "queues" which contain a series of videos to review. The TCS software also provides the tools for viewing and flagging videos that are reviewed.

19. Plaintiff had his work tracked and flagged for review by moderators from TikTok to check for accuracy and speed. Plaintiff was supervised by TikTok personnel and took direction from them to accomplish his daily tasks, including those that caused him harm.

20. The TCS software, beyond being the means for Plaintiff to review content for Defendants, constantly tracked and watched Plaintiff.

21. The TCS software will flag any time a content moderator spends away from reviewing videos, allowing Defendants to condition payment, push speed quotas, and otherwise control the daily work of content moderators as they are under constant surveillance.

22. As stated above, Defendants recognize the dangers of exposing users to images and videos of graphic violence. In December 2020, before Mr. Young was hired, TikTok updated its community guidelines, available at www.newsroom.tiktok.com/en-us/refreshing-our-policies-to-support-community-well-being, to foster well-being on its platform to address distressing content like suicide and self-harm.

23. Plaintiff Young was hired by Atrium. Plaintiff Young only performed content moderation services for TikTok while employed by Atrium. Plaintiff Young used Defendants' TCS to

perform content review for TikTok while employed by Atrium.

24. Plaintiff was trained directly with TikTok standards and was responsible for taking tests and learning materials provided by Defendants that would then be reviewed and evaluated by Defendants to determine if they were meeting Defendants' standards.

25. Plaintiff was quizzed weekly at Defendants' behest, monitored by Defendants, and would be emailed if his flagging of videos and questionable content was deemed unworthy.

26. Defendants sent daily updates to their flags for tagging videos. These updates directly instructed Plaintiff on how to do his daily tasks and controlled the minutia of how he reviewed content.

27. Defendants oversee all content moderation through their U.S. Safety Team located in Los Angeles, California.

28. Defendants withhold payment to content moderators if they are not on the TCS application beyond their allotted breaks (two fifteen-minute breaks and one hour-long lunch break for a twelve-hour workday), directly determining employee compensation. On information and belief, ByteDance and TikTok would threaten content moderators who did not meet time requirements with demotions to lower paid positions.

29. This practice is further reflected in ByteDance and TikTok's overseas operations. In a report from the Bureau of Investigative Journalism, reporters found that workers who didn't meet goals could lose bonuses that were up to a quarter of their salary.

30. ByteDance and TikTok provide the video queues that Plaintiff worked on, grouping and sending over flagged content for review. Plaintiff was provided with queues of videos and content that dictated his day-to-day assignments. On information and belief, these queues were highly

inaccurate, and graphic content frequently was in queues that were meant to exclude graphic content, providing Plaintiff with no respite from seeing graphic content.

31. ByteDance and TikTok provided the information on how many videos to review, how to review the videos, what content is considered to be actionable, and the tags that are placed on videos to indicate content. This includes changing directives as to what content is actionable and guidelines on how to properly use both the TCS proprietary software and how to generally approach content moderation.

32. Plaintiff's ostensible employer did little more than issue paychecks. Virtually every other aspect of Plaintiff's job was affirmatively controlled by Defendants, including the harmful quotas that they imposed on Plaintiff.

33. Plaintiff was required to watch and view traumatic content daily.

34. While content moderators do an immense public service, Defendants push content moderators to watch as many videos as possible, exacerbating the harm to content moderators through punishing speed and accuracy quotas. Defendants are aware that their harsh requirements create an increased risk that content moderators will develop PTSD and related disorders. Still, despite knowing the harm they were causing, Defendants continued to institute harmful work conditions and failed to provide adequate services to content moderators, including Plaintiff.

35. If a content moderator wishes to step away to catch their breath after seeing a graphic video, whether sexual abuse, violence, or other traumatic content, they are out of luck. Content moderators are punished for time away from the TCS application, both by losing on their stringent speed metrics, risking a potential demotion to a lower pay bracket or bonuses that comprise a substantial part of their salary, and their ability to secure better shifts or time slots

Case no. 22-cv-01883-VC
Third Amended Complaint

Defendants withhold payment to content moderators if they are not on the TCS application beyond their allotted two fifteen-minute breaks and a one-hour-long lunch break, directly determining employee compensation.

36. Plaintiff was monitored directly by Defendants through the TCS software. If Plaintiff did not not perform to Defendants' standards, including meeting their unsafe quotas, he would be be flagged for reprimand or further penalties and Defendants would either carry out such steps itself or instruct Atrium to do so.

37. On information and belief, content moderators were punished by having promotional opportunities denied, receiving the worst shift times, and having their pay withheld if they did not match speeds mandated by the Defendants. Content moderators were mandated by TikTok and ByteDance to review videos exceptionally quickly, with just a few seconds per video on average. If they took longer to determine if a video was against the guidelines, their metrics would suffer and they would be punished. Content moderators reported having to accept unfavorable shift time slots, lower pay, and loss of advancement opportunities if their time slipped from Defendants' imposed metrics.

38. As these time pressures were intense, Plaintiff was at an increased risk of injury.

39. Speed metrics and pressure to get through video quotas were directly imposed by Defendants, with Defendants conditioning pay based on speed and providing the tags and metrics used in their proprietary TCS software that dictated how content moderators viewed and reviewed videos.

40. In addition to failing to provide any wellness help, Defendants continuously increased the workload on content moderators by increasing the number of tags attributed to videos and

Case no. 22-cv-01883-VC
Third Amended Complaint

increasing the specificity of review.

41. This adding of tags was done nearly every day. Defendants were constantly sending updates to content moderators changing how they review the content and what to look for in each video.

42. During his employment as a content moderator, Plaintiff was exposed to endless graphic and objectionable videos including murder, graphic violence, sexual assault, and child pornography.

43. Despite being aware of the harms of exposure to graphic content, Defendants continued to push for speed over safety and penalize workers who attempt to protect their mental health.

44. Plaintiff spent his days repeatedly watching videos that contained intense graphic violence, sexual abuse, and other traumatic content without proper safeguards due to the control and pressure exerted on content moderators by Defendants. The unsafe quotas imposed by Defendants caused harm to the Plaintiff.

45. It is well known that exposure to images of graphic violence can cause debilitating injuries, including Post Traumatic Stress Disorder ("PTSD"), anxiety and depression.

46. Whereas viewing or hearing about another person's traumatic event used to be considered "secondary traumatic stress," the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 5th ed. 2013) ("DSM-5") recognizes that exposure to trauma, such as repeated or extreme exposure to aversive details of trauma through work- related media, meets the first diagnostic criterion for PTSD.

47. In a study conducted by the National Crime Squad in the United Kingdom, seventy-six percent of law enforcement officers surveyed reported feeling emotional distress in response to

exposure to child abuse on the internet. The same study, which was co-sponsored by the United Kingdom's Association of Chief Police Officers, recommended that law enforcement agencies implement employee support programs to help officers manage the traumatic effects of exposure to child pornography.

48. In a study of 600 employees of the Department of Justice's Internet Crimes Against Children task force, the U.S. Marshals Service found that a quarter of the cybercrime investigators surveyed displayed symptoms of psychological trauma, including secondary traumatic stress.

49. Another study of cybercrime investigators from 2010 found that "greater exposure to disturbing media was related to higher levels of . . . secondary traumatic stress" and that "substantial percentages" of investigators exposed to disturbing media "reported poor psychological well-being."

50. The Eyewitness Media Hub has also studied the effects of viewing videos of graphic violence, including suicide bombing, and found that "40 percent of survey respondents said that viewing distressing eyewitness media has had a negative impact on their personal lives."

51. While there is no way to eliminate the risk created by exposure to graphic and objectionable content, there are ways to mitigate it. It is known that especially demanding job requirements or a lack of social support reduce resilience in the face of trauma exposure and increase the risk of developing debilitating psychological symptoms.

52. Content moderators are of increasing concern to the medical community for PTSD and similar injury resulting from the review of graphic content. This is reflected in numerous media articles and suggestions for best practices throughout the industry aimed at protecting moderators'

Case no. 22-cv-01883-VC
Third Amended Complaint

health.

53. Depending on many factors, individuals who have experienced psychological trauma may develop a range of subtle to significant physical and psychological symptoms, including extreme fatigue, dissociation, difficulty sleeping, excessive weight gain, anxiety, nausea and other digestive issues.

54. PTSD symptoms may manifest soon after the traumatic experiences, or they may manifest later, sometimes months or years after trauma exposure. The Americans with Disabilities Act recognizes that certain diseases can manifest into disabilities and describes PTSD as a "hidden disability" on its website: https://www.ada.gov/servicemembers_adainfo.html.

55. Trauma exposure and PTSD are also associated with increased risk of chronic health problems, including cardiovascular conditions, pain syndromes, diabetes, and dementia.

56. There is growing evidence that early identification and treatment of PTSD is important from a physical health perspective, as several meta-analyses have shown increased risk of cardiovascular, metabolic, and musculoskeletal disorders among patients with long-term PTSD.

57. Psychological trauma and PTSD are also often associated with the onset or worsening of substance use disorders. Epidemiologic studies indicate that one-third to one-half of individuals with PTSD also have a substance use disorder. Compared to individuals without PTSD, those with PTSD have been shown to be more than twice as likely to meet the diagnostic criteria for alcohol abuse or dependence; individuals with PTSD are also three to four times more likely to meet the diagnostic criteria for drug abuse or dependence.

58. An individual's risk of developing PTSD or associated symptoms may be reduced through prevention measures, categorized as primary, secondary, and tertiary interventions. Primary

interventions are designed to increase resilience and lower the risk of future PTSD among the general population. Secondary interventions are designed to lower the risk of PTSD among individuals who have been exposed to trauma, even if they are not yet showing symptoms of traumatic stress. Finally, tertiary interventions are designed to prevent the worsening of symptoms and improve functioning in individuals who are already displaying symptoms of traumatic stress or who have been diagnosed with PTSD.

59. Defendants are and were aware of the damage that disturbing imagery could have on content moderators. They are members of the Technology Coalition, which was created "to develop technology solutions to disrupt the ability to use the Internet to exploit children or distribute child pornography."

60. Other members of the Technology Coalition include Meta, YouTube, Snap Inc. and Google, all firms with similar content moderation challenges. Meta and YouTube have both changed their practices when content moderators brought similar claims against them.

61. In January 2015, the Technology Coalition published an "Employee Resilience Guidebook for Handling Child Sex Abuse Images" (the "Guidebook").

62. According to the Guidebook, the technology industry "must support those employees who are the front line of this battle."

63. The Guidebook recommends that internet companies implement a robust, formal "resilience" program to support content moderators' well-being and mitigate the effects of exposure to trauma-inducing imagery.

64. With respect to hiring content moderators, the Guidebook recommends:

> a.  In an informational interview, "[u]se industry terms like 'child

sexual abuse imagery' and 'online child sexual exploitation' to describe subject matter";

b.  In an informational interview, "[e]ncourage candidate to go to websites [like the National Center for Missing and Exploited Children] to learn about the problem";

c.  In follow-up interviews, "[d]iscuss candidate's previous experience/knowledge with this type of content";

d.  In follow-up interviews, "[d]iscuss candidate's current level of comfort after learning more about the subject";

e.  In follow -up interviews, "[a]llow candidate to talk with employees who handle content about their experience, coping methods, etc."; and

f.  In follow-up interviews, "[b]e sure to discuss any voluntary and/or mandatory counseling programs that will be provided if candidate is hired."

65. With respect to safety on the job, the Guidebook recommends:

a.  Limiting the amount of time an employee is exposed to child sexual abuse imagery;

b.  Teaching moderators how to assess their own reaction to the images;

c.  Performing a controlled content exposure during the first week of employment with a seasoned team member and providing follow-up counseling sessions to the new employee;

d.  Providing mandatory group and individual counseling sessions

Case no. 22-cv-01883-VC
Third Amended Complaint

administered by a professional with specialized training in trauma

intervention; and

e.   Permitting moderators to "opt-out" from viewing child sexual abuse

imagery.

66. The Technology Coalition also recommends the following practices for

minimizing exposure to graphic content:

a.   Limiting time spent viewing disturbing media to "no more than four

consecutive hours";

b.   "Encouraging switching to other projects, which will allow professionals to

get relief from viewing images and come back recharged and refreshed";

c.   Using "industry-shared hashes to more easily detect and report

[content] and, in turn, limit employee exposure to these images.

Hash technology allows for identification of exactly the same

image previously seen and identified as objectionable";

d.   Preventing content moderators from viewing child pornography one

hour or less before they end their workday; and

e.   Permitting content moderators to take time off as a response to trauma.

67. According to the Technology Coalition, if a company contracts with a third-party vendor

to perform duties that may bring vendor employees in contact with graphic content, the company

should clearly outline procedures to limit unnecessary exposure and should perform an initial audit of

the independent contractor's wellness procedures for its employees.

68. Plaintiff was forced to perform his work through the TCS software, which monitored

him for any time away from reviewing material. Thus, Plaintiff was unable to switch or limit his time viewing graphic materials.

69. Plaintiff was unable to the content he saw. Although Defendants purported to organize queues so that harmful content could be avoided, Plaintiff continued to receive graphic content in queues that were not supposed to contain graphic material. Due to Defendants' lack of proper sorting of the queues, Plaintiff was not able to switch to other projects that would have allowed him to refresh, was not allowed to opt out of graphic content after four consecutive hours and was unable to limit viewing of child pornography one hour or less than before they end their workday. This caused harm to Plaintiff.

70. The National Center for Missing and Exploited Children ("NCMEC") also promulgates guidelines for protecting content moderators from psychological trauma. For instance, NCMEC recommends changing the color or resolution of the image, superimposing a grid over the image, changing the direction of the image, blurring portions of the image, reducing the size of the image and muting audio.

71. Based on these industry standards, various internet companies take steps to minimize harm to content moderators. Some notable measures include the use of filtering technology to distort images, and the provision of mandatory psychological counseling for content moderators.

72. Defendants failed to implement the aforementioned standards as a member of the Technology Coalition. Instead, Defendants imposed productivity standards and daily work quotas that were irreconcilable with applicable standards of care and pushed Plaintiff past reasonable limits, causing harm.

Case no. 22-cv-01883-VC
Third Amended Complaint

73. Defendants claim that content moderators could opt out of viewing child pornography content. However, on information and belief, such promises proved illusory. Even labeled queues, that were supposed to contain less graphic information, were commonly filled with a mix of materials, including the supposedly excluded graphic content. Plaintiff could not trust the queues to not contain graphic and traumatic imagery, causing harm.

74. Defendants also fully controlled the training and guidance that was provided to Plaintiff to conduct his work. Defendants provided the instructions, training manuals, and provided updates to the review policies.

75. Through this control, Defendants failed to provide the tools for Plaintiff to handle the work he was given, including not providing the pre-screening interview questions that the Technology Coalition recommended to prevent harm.

76. Offered counseling was not focused on the traumatic nature of the work, and instead focused on unrelated topics or included benefits such as a meditation app.

77. Defendants thus did not provide the technological safeguards, did not follow proper guidance on how to train moderators, and did not conform to industry standards that they themselves helped write to protect content moderators from the graphic content they were required to see.

78. Defendants' actions and failure to act, as set forth in this Amended Complaint, resulted in Plaintiff being exposed to unsafe amounts of dangerous content which included a relentless stream of graphic and objectionable videos, including violence, sexual assault, and child pornography.

79. As a result of constant and unmitigated exposure to highly toxic and extremely

disturbing images at the workplace, Plaintiff suffered from stress and psychological harm. Furthermore, the lack of adequate prophylactic measures and the lack of counseling services and/or ameliorative measures led Plaintiff to seek counseling on his own time and effort.

80. Defendants failed to implement workplace safety measures that meet industry standards that other companies and non-profits have implemented and have failed as well to implement the standards suggested by the Technology Coalition, despite being a member even though they knew, in the case of Plaintiff, that such steps were necessary to prevent harm.

81. All content moderation training is done at the direction of Defendants, with training being based on Defendants' materials and tailored to utilizing Defendants' proprietary software.

82. All instructional materials and training materials are provided by Defendants. All content moderation occurred through the TCS software, and Defendants were the sole instructors for how to operate the TCS software and implement TikTok guidelines, guidelines that changed daily.

83. During the hiring and training process, Defendants do not inform Plaintiff about the nature of the work or the effect reviewing graphic content can have on his mental health. He was not asked about his previous experience with graphic content. He was not told that this content can have a significant negative mental health impact. He was not permitted to preview the graphic content or advised to seek out other outside information during the hiring process.

84. In addition to this, Plaintiff was not trained on how to address the reactions he was going to have to the images he was going to see. He was not eased into his job through controlled exposure to graphic content with a seasoned team member, followed by counseling sessions. Despite sending daily updates on what content to flag, and in what way, Defendants provided no training on how to address his personal reactions to the content he reviewed, leaving Plaintiff ill-

equipped to handle the risks of the job and resulting in harm.

85. Training videos were significantly tamer than what Plaintiff was exposed to while on the job, leaving him unprepared for the mental stress and harm that he was subjected to, exacerbating the risk of harm.

86. Defendants' training materials, thus, are woefully inadequate in light of the standards of the industry, standards Defendants themselves helped write.

87. Before Plaintiff began work, he was required to sign a non-disclosure agreement. The non-disclosure agreement was required by Defendants, and that agreement caused harm to Plaintiff by forcing him to bottle up inside imagery too horrific to keep inside.

88. Defendants also failed to provide safeguards known to mitigate the negative effects of reviewing graphic content.

89. Plaintiff was required to review hundreds of graphic and disturbing videos each week.

90. Defendants imposed strict quantity and accuracy quotas on content moderators. Plaintiff was required to review videos for extremely short periods, just 15 seconds in some cases, and expected to have an accuracy rate of up to 95%.

91. Defendants control how the videos are displayed. This is done through Defendants' proprietary TCS software that was used by Plaintiff. Despite their awareness of the impact of reviewing graphic content, Defendants fail to implement well-accepted standards to mitigate harm to Plaintiff. Defendants could have, but failed to, implement safeguards on their content moderation tools—including changing the color or resolution of the video, superimposing a grid over the video, changing the direction of the video, blurring portions of the video, reducing the size of the video, and muting audio—that could have mitigated some of the harm caused by reviewing

graphic and disturbing content. This is also an acknowledged standard of care which Defendants have failed, and this failure has caused Plaintiff's injuries.

92. This failure is especially glaring considering the reasonably uncomplicated nature of many of the tool-related changes. Defendants have full control over the TCS software. Blurring images and videos and providing tags for ultra-graphic violence would take little time to implement and could provide significant benefits to the health and safety of content moderators.

93. Defendants failed to provide wellbeing care and psychological support to Plaintiff even though it knew that Plaintiff needed this care and support due to the extreme nature of the work that he was doing.

## IV.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION – NEGLIGENCE

100. Plaintiff realleges and incorporates by reference herein all allegations above.

101. Defendants owed a duty of care to Plaintiff, and their conduct fell below the applicable standard of care amounting to a breach of that duty. Plaintiff was injured as a result of this breach, and Defendants' breach was the cause of Plaintiff's injury.

102. The hirer of an independent contractor is liable to an employee of the contractor insofar as the hirer's negligent exercise of retained control affirmatively contributed to the employee's injuries.

102. If an entity hires an independent contractor to complete work but retains control over any part of the work, the hiring entity has a duty to the independent contractor's employees or subcontractors to exercise that control with reasonable care.

103. If the hiring entity negligently exercises its retained control in a manner that affirmatively contributes to the injuries of the contractor's employees or subcontractors, the hiring entity is liable for those injuries.

Case no. 22-cv-01883-VC
Third Amended Complaint

104. At all times relevant to the allegations herein, Plaintiff was engaged by Atrium but working for and at the direction of Defendants.

103. Defendants retained control over certain aspects of the work performed by Plaintiff, including but not limited to:

   a. Failing to properly warn Plaintiff of risks before he began work;

   b. Failing to follow an appropriate interview process for this type of work;

   c. Requiring Plaintiff to use Defendants' proprietary TCS software that presented unmitigated traumatic and harmful content to Plaintiff without any adequate safeguards or mitigating care;

   d. Imposing quotas that were unsafe and which caused harm to Plaintiff;

   e. Requiring that Plaintiff sign an NDA and undergo Defendants'-developed confidentiality trainings that prohibited Plaintiff from discussing his work outside his review teams in the absence of any mitigating measures for the serious harm caused;

   f. Requiring that content moderators be interviewed and undergo training using training materials and procedures exclusively created by Defendants; and

   g. Setting unrealistic and onerous work quotas and time demands.

94. The aforementioned list shows that Defendants did not merely exert general control over aspects of work, but rather, maintained and exercised retained control over Plaintiff's work conditions at all times. Based on its exercise of retained control, Defendants have had at all relevant times a duty to exercise reasonable care with regard to the safety of Plaintiff.

Case no. 22-cv-01883-VC
Third Amended Complaint

104. Defendants negligently exercised their retained control and, as a result, affirmatively contributed to the creation and persistence of the harm to Plaintiff at his workplace. Such acts were done in a manner that affirmatively contributed to the injuries of Plaintiff, including by exacerbating Plaintiff's risks of developing PTSD or other health issues.

105. Defendants were aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder and other forms of extreme violence.

95. Defendants were also aware or should have been aware that the review technology they provided and mandated could be made safer if proper precautions were followed, that requiring Plaintiff not to discuss his work or workplace conditions reduced their ability to deal with traumatic content, and that Defendants' overall quality and quantity standards had the effect of imposing intense workplace stress and, accordingly, increasing Plaintiff's risk of injury from psychological trauma.

96. Defendants breached their duty to Plaintiff by failing to provide the necessary and adequate technological safeguards, safety and instructional materials, warnings, social support, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through TCS.

97. Defendants continued to breach their duty to Plaintiff by failing to exercise retained control with reasonable care, and that breach caused harm to Plaintiff.

98. Defendants were aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through

Case no. 22-cv-01883-VC
Third Amended Complaint

its review platforms.

99. Defendants were aware or should have been aware that their review platforms could be made safer if proper precautions were followed.

106. Defendants nevertheless provided unsafe review tools to Plaintiff that exposed Plaintiff to unmitigated traumatic content.

100. Defendants breached their duty to Plaintiff by failing to provide necessary and adequate technological safeguards, safety and instructional materials, warnings, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through Defendants' review platforms.

101. Plaintiff suffered injuries as a result.

107. Plaintiff seeks damages for the injuries he suffered.

108. Plaintiff also seek an award of attorney's fees.

## SECOND CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

109. Plaintiff realleges and incorporates by reference herein all allegations above.

110. Defendants' conduct as alleged above was intentional and/or reckless, so outrageous that it is not tolerated by civilized society, and resulted in serious mental injury to Plaintiff.

111. As set forth above Defendants were aware at the time that Plaintiff was performing content moderation work that, as a result of the nature of the work, wellbeing services were essential to protect content moderators from injury.

112. As set forth above, Defendants were aware at the time that Plaintiff was performing content moderation work that his ostensible employer, Atrium, was not providing necessary

wellbeing services and was not capable of providing appropriate wellbeing services.

113. Despite this knowledge, Defendants subjected Plaintiff to an endless onslaught of disturbing and traumatic content, knowing that it would cause injury and knowing that nothing was being done to warn of this injury, to protect against or mitigate the risks of this injury, or to provide care for this injury.

114. Intentionally exposing another to things that one knows will cause injury to that person is conduct that is not tolerated by a civilized society, yet this is what Defendants did as evidenced by the allegations of Paragraph 12 and Exhibit A.

115. Plaintiff suffered serious mental injury as a result of this conduct by Defendants.

### V.    PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

        a.  Order Defendants to pay compensatory damages to Plaintiff;

        b.  Award any further relief that this Court deems just and equitable.

### VI.    DEMAND FOR JURY TRIAL

Plaintiff requests trial by jury.

Dated: July 17, 2025               Respectfully Submitted,

                        **STEVEN WILLIAMS LAW, P.C**.

             By:    *Steven Williams*
                        Steven N. Williams
                        201 Spear Street, Suite 1100
                        San Francisco, CA 94105
                        Tel: 415-697-1509
                        Fax: 415-230-5310
                        swilliams@stevenwilliamslaw.com

Exhibit A

# [Request] Nashville TnS Contractor Conversion

## Approvals needed

☑

☑

## Background

Currently 90% of the Nashville based Trust and Safety moderation team (165 people) are contractors (10% of the workforce consistent of people managers were previously approved for conversion [ HYPERLINK "https://bytedance.feishu.cn/docs/doccnud0VjZa6DGFvDnbvKWUUme" \h ]). We are requesting to begin conversion process for an additional 60% (total 70% of the entire workforce) of Associates to be converted to FTEs given the following reasons:

1. **Specialization**: some of the workflows are necessary long term and the knowledge gained should be retained & grown in-house (eg. Kids mode, policy specific queues). **ERG/Creator team requests for cultural understandings of US/CA norms.**

2. **Data access:** Access to content and user data that is necessary for review, troubleshooting and investigation that we do not want to make available through a staffing agency or BPO. (eg. Lighthouse with access to non-public information)

3. **Sensitive content:** some of the workflows require extended exposure to distressing content. Access to adequate wellbeing services must be made available and staffing agencies are inadequately equipped to do so.

By the end of the 2021, we expect to have a total of 300 headcount in Nashville TnS, of which 210 will be FTEs.

## Overview & Key Concerns

• Forced turnover: Without conversion, we will face forced scaled turnover of tenured and skilled Agents given contractors cannot be retained past 12 months (October 2021).

• Alignment with co-located User Support team. Due to similar reasons, User support team has already begun their conversion process. US Safety should align to a similar schedule and process to ensure similar job leveling and cohesiveness in the workplace across the Nashville site. For reference; [ HYPERLINK

> **Commented [1]:** Approved

**Exhibit 0062**
7/23/2024

YOUNG-00011088

"https://bytedance.feishu.cn/docs/doccn595xiHvKcTp6qPSnL9h9Nc" \h ]  & [ HYPERLINK
"https://bytedance.feishu.cn/docs/doccnUvLJelHzDDj8wdm087c9uc" \h ]



| | Description | Pros | Risks/Impact |
|---|---|---|---|
| **Decision:** | Convert main portion of workforce (70%). Maintain contracted roles for intro/ "probation perriod" (30%). | • Content moderations is a unique responsibility, making a clear distinction between contractor and FTE roles especially for specialized - sensitive queues.<br><br>• Wellness is vital for TnS team members. Currently TPAs do not receive wellness services. The need for FTE conversion to allow for wellbeing services is necessary. | • Requires massive turnover and rebuilding. We'll need to interview and onboard 112+ new Associates June-November. Our existing workforce will reach the 12th month of their contract starting in October.<br><br>○ This process will take 5 months and result in an estimated case response times of 7+ days, with lower quality leading to an |

YOUNG-00011089

unideal user experience.

◦ Atrium/ Intellipro, our vendor has advised the talent pool has declined due to Nashville-based companies re-hiring.

◦ Upon converting 30% we expect those not converted to leave prior to their contract ending due to clear lack of future. This will result in increased case backlog

• We'll have forced massive turnover annually.



◦ While Intellipro & Atrium will remain our third party employment partners, this will take ample Team Lead and Talent Acquisition time.

◦ We expect ongoing turnover of contractors (currently 7 people/mos) resulting in need to consistently backfill and train

◦ Quality of work is low for new hires within the first 60 days while they are

CONFIDENTIAL

learning. Internal partners and users may see effects of this.

- Low engagement

  ○ Contracted teams result in lower investment in the work, especially when there is no opportunity for FTE, than FTE. This will result in lower quality responses for our users.

- Not all existing contractors will meet our high standards for conversion. This will result in the need to onboard a to-be-determined number of contractors on a temp-to-hire expectation.

  ○ Quality of work is low for new hires within the first 60 days while they are learning. The team responding to case and our users may feel the effects of this.

  ○ Expected turnover/low engagement of associates.

    . Contracted teams result in higher turnover and lower investment in the work. Ongoing turnover will result in (a) lower

YOUNG-00011091

productivity and therefore a slower user response time (b) the need for ongoing backfilling.

## Conversions Timeline:

| Type | Today (August) # | % | September 2021 # | % | October 2021 # | % | November 2021 # | % | January 2022 # | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Contractor | 150 | 100% | 150 | 75% | 145 | 60% | 120 | 45% | 70 | 25% |
| TPA to FTE | 0 | 0% | 50 | 25% | 50 | 25% | 50 | 30% | 50 | 40% |
| Total FTEs | 0 | 0% | 50 | 25% | 100 | 40% | 150 | 55% | 200 | 75% |
| Total Moderator HC at COE | 150 | N/A | 200 | N/A | 245 | N/A | 270 | N/A | 270 | N/A |

## Headcount Distribution by Function:

*Note: All headcount numbers are estimates as some workflows can be crosstrained. Some workflows are still in the planning process so headcount numbers are based on estimated product demands.*

| Conversion Reason | Function: | Headcount Distribution: | Current Headcount: | Headcount to be Converted TPA ->FTE (Jan 2022) | Hours of Operations: |
|---|---|---|---|---|---|
| | | | | | |

YOUNG-00011092

| No conversion | Video moderation | Failover headcount | 32 | 0 | 24/7 |
|---|---|---|---|---|---|
| No conversion | Live moderation | Failover HC | 50 | 0 | 24/7 |
| No conversion | Video Appeals | TBD | 5 | 5 | 24/7 |
| Data access | Live User Appeals | TBD | 10 | 10 | 7 days coverage |
| Data access | Live Account Review | TBD | 4 | 5 | 7 days coverage |
| Data Access/ Specialized | Hashtag queue | 10 | 0 | 10 | 7 days coverage |
| Specialized | Badness | TBD | 4 | 4 | 5 days coverage |
| Specialized | Kids mode | 15 | 0 | 15 | TBD |
| Specialized | Quality Assurance | 40 | 25 | 40 | M-F |
| Specialized | Policy Testing Strike Team (Sits within Incident Mgmt) | 10 | 0 | 10 | 7 days coverage |
| Specialized | Mis/Dis queue | 15 | 18 | 15 | 7 days coverage |

YOUNG-00011093

| Speci alized/ Sensit ive conte nt | Policy specific queues (eg. ANSA, hate speech, bullying) | 25 | 0 | 25 | 24/7 |
|---|---|---|---|---|---|
| Speci alized/ Sensit ive conte nt | Incident Management | 15 | 12 | 15 | 7 days coverage |
| Speci alized/ Sensit ive conte nt | Flex Team | 15 | 0 | 15 | 7 days coverage |
| Sensit ive Conte nt | LERT (predator queue) | 20 | 0 | 20 | 24/7 |
| | **Total** | **270** | **146** | **205** | |

Source: [ HYPERLINK "https://bytedance.feishu.cn/docs/doccnWOJFtTWXgX7KqDETJryZQf" \n ]

## Stakeholders

- **Decision maker(s):**
  - ‘
- **Other Stakeholders:**
  - ¡

YOUNG-00011094

## Cost Analysis

### Considerations

• Cost that are the same for both employment types are not included in this calculation, such as:

○ Real Estate and Utility Cost - same for both employment type once return to office

○ IT Equipment Cost - we are providing equipment to both employment types

○ TnS Lead roles - would be FTE regardless of the employment type of front line TnS Agents

○ Conversion Cost - there is no cost of conversion after 5.25 months of service as contractors

• The current cost for contractors is a fixed rate of $28.85 per hour per person, paid to the vendor

• FTE cost would include the following component

○ Hourly wage: from $18 to $25 based on CBP's comp research in Nashville, variations including role difference and future career progression. Use $21.5 as average for calculation below. This is more aggressive than the previous analysis taking into consideration our intention to be competitive in the market

○ Target Annual Bonus: 12.5% of base

○ Benefits & Social costs for FTE only: around 20% of base

Comparisons

### Comparisons on Cost per Person

[sheet-shtcnDJeU9pesXwY20V067R7sle_xFIJVR]

**On average, the financial cost per person for FTE is $754 less than contractor for Nashville site.**

CONFIDENTIAL